

**SIGNED this 5th day of July, 2022**

_Shelley D. Rucker_
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **In re:** | |
| **River City Resort, Inc.,**  Debtor. | No. 1:14-bk-10745-SDR<br><br>Chapter 7 |
| | |
| **Jerrold D. Farinash,** *Trustee*,  Plaintiff, | |
| v. | Adv. No. 1:18-ap-01044-SDR |
| **James L. Henry, Jr.,**  Defendant. | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On March 31, 2022, the Court issued a Memorandum Opinion (the "Prior Opinion") and accompanying order (the "Prior Order") addressing several motions that were pending in this adversary proceeding and in Adversary Proceeding No. 1:18-ap-01029-SDR. (Doc. Nos. 116, 117.) Two new motions now are pending: 1) a motion by defendant James Henry ("Henry") to

amend the Prior Order under Civil Rule 59(e), made applicable by Bankruptcy Rule 9023 (Doc. No. 123); and 2) the Trustee's motion for a final judgment with respect to the avoidance issue that the Court addressed in the Prior Opinion (Doc. No. 126). One other matter requires attention. In the Prior Opinion, the Court provisionally granted Henry summary judgment on Count 3 of the adversary complaint, which was an objection to Henry's Claim 16 in Main Case No. 1:14-bk-10745-SDR (the "Main Case"). Summary judgment on Count 3 was provisional because the Court invoked Civil Rule 56(e)(1) and gave the Trustee a chance to be more specific about why some or all of the legal billing making up Claim 16 should be disallowed. (Doc. No. 116 at 43.) The Trustee now has filed supplemental briefing in opposition to summary judgment, and Henry has responded.

The Court held oral argument on June 23, 2022, for all three pending matters. The Court will address each matter in more detail below. For the sake of brevity, the Court will repeat case history only as needed and otherwise assumes familiarity with the Prior Opinion.

## II. MOTION TO AMEND THE PRIOR ORDER

On September 26, 2016, the Trustee filed a motion to settle the claims of three sets of creditors: 1) members of the Casey family, who became known as the "Casey Creditors"; 2) a set of creditors who became known collectively as the "Barge Cafe Creditors"; and 3) David L. Moss ("Moss"). (Main Case, Doc. No. 374.) The motion stated that the Trustee asserted that the Casey Creditor claims should be considered equity, rather than debt, pursuant to the theories of equitable subordination, re-characterization of debt to equity, or implied partnership. (*Id.* at 2.) The Trustee also represented that all of these creditors who claimed liens against the real property which constituted the primary assets of the estate would oppose the sale of that property if the settlement

2

was not approved. (*Id.*) Over Henry's objection, the Court granted the motion and approved the settlement on November 7, 2016. (Main Case, Doc. No. 393.)

Among other provisions of the settlement, the Trustee avoided approximately $2 million of liens held by the Casey Creditors. When the time came for dispositive motions in this adversary proceeding, the Trustee filed a motion for partial summary judgment that Henry's Claim 16 was unsecured because of the partial avoidance of the Casey Creditors' liens. In the Prior Opinion, the Court granted the Trustee's motion and held that the avoided portion of the Casey Creditors' liens was preserved for the benefit of the estate and was superior to Henry's lien because of the preservation provided by 11 U.S.C. § 551. (Doc. No. 116 at 33.) Specifically, the Court concluded

> that the lien was preserved for the benefit of the estate and that there were no findings in the Settlement Order on which Henry may rely to show that his lien is superior to that of the Casey Creditors. Such a result does not unduly prejudice Henry, who had actual knowledge that his lien was recorded after the liens of the Casey Creditors. Section 551 thus operates, as a matter of law, to maintain the avoided portion of the Casey Creditors' lien as superior to Henry's lien.

(*Id.*) The preservation of priority under Section 551 made Henry's lien unsecured because the sale price for the property was not more than the pre-avoidance amount of the Casey Creditors' lien.

Henry filed his motion to amend because he believes that the Court misunderstood how the Trustee settled with the Casey Creditors and how lien preservation works under the Code. The Trustee's representations made in the motion to approve the settlement, according to Henry, are binding on the Trustee for purposes of analyzing the status of the avoided lien. If the Trustee's position was that the Casey Creditors' liens were equity rather than debt, and his grounds for avoidance relied on state law, then the priority of the avoided portion was not preserved for the benefit of the estate under Section 551. (Motion, Doc. No. 124 at 2.)

3

Henry argues further that his interpretation of the settlement has to be correct or else the Trustee improperly paid lien holders out of order. In the same settlement, the Trustee also settled claims with the Barge Cafe Creditors and with Moss—lien holders junior to the Casey Creditors. In Henry's view, the settlement should not have authorized payment to those junior lien holders if the estate lacked the funds to pay Henry's lien. "There would not have been sufficient funds to pay any of their [secured] claims since some were junior to Henry. The answer had to be that the junior liens remained and moved up in priority, or surely the Trustee would have paid them nothing." (*Id.* at 2.)

The Trustee responds that "all of the arguments set forth by Henry are arguments already litigated or arguments he could have brought to the Court's attention earlier." (Doc. No. 133 at 2.) The Trustee's position is that the settlement recited that the lien was avoided and was preserved for the estate under 11 U.S.C. § 551 for the benefit of the estate without further justification of the payment of junior creditors.

"A court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citation omitted). The moving party has the burden of "showing that alteration or amendment of the original judgment is appropriate." *Barclay v. Reimer & Lorber Co. (In re Barclay)*, 337 B.R. 728, 2006 WL 238139, at *6 (B.A.P. 6th Cir. Feb. 1, 2006) (table case) (internal quotation marks and citation omitted). "A motion under Rule 59(e) is not an opportunity to re-argue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (citation omitted). Additionally, "Rule 59(e) motions cannot be used to present new arguments that could have been

4

raised prior to judgment." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (citations omitted). Henry has invoked the first and fourth grounds for relief under Rule 59(e). The Court will review each ground asserted and will elaborate on its prior reasoning to resolve the divergent views that the parties have taken.

### A. *Clear Error and Section 551*

To establish a clear error of law, Henry needs to demonstrate a "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation marks and citation omitted); *accord Dorger v. Allstate Ins. Co.*, No. CIV.A. 2:08-56-DCR, 2009 WL 2136268, at *1 (E.D. Ky. July 16, 2009). "An intervening change in the controlling law is also an acceptable reason for granting a Rule 59(e) motion." *Dorger*, 2009 WL 2136268, at *1 (citation omitted). Ultimately, "[t]he clear error of law standard under Rule 59(e) is exceptionally high, requiring the movant to establish not only that the errors were made, but that these errors were so egregious that an appellate court would not affirm the judgment." *Grace v. Kentucky*, No. 5:20-CV-00036-TBR, 2021 WL 5702436, at *2 (W.D. Ky. Dec. 1, 2021) (internal quotation marks and citations omitted).

The fundamental problem with which the Court and the parties have wrestled, and that potentially is the source of clear error, is that the settlement never identified exactly which avoidance power the Trustee chose when settling with the Casey Creditors. As the Court noted above, the settlement recited the position of the Trustee and of the Casey Creditors (Main Case, Doc. No. 374 at 2); invoked 11 U.S.C. §§ 541, 542, 544, 547, 548, 549, 550, and 551 in conclusory fashion (*id.* at 3); and then proceeded to set forth the details of the settlement terms. The Court previously found an analytical path that led to the preservation of lien priority and that did not require backfilling the parties' motives and intent in reaching the settlement. Henry's reply brief

5

(Doc. No. 136) makes a persuasive argument that the operative section had to be Section 544. Sections 541, 542, 547, and 549 do not match the Trustee's assertion that he was challenging the Casey Creditors' claims on the basis of equitable subordination, recharacterization of debt to equity, or implicit partnership. Analysis of Henry's position using Section 544 also is consistent with how the Trustee described the settlement in his Notice of Sale of July 1, 2016. (*See* Main Case, Doc. No. 341 at 15 ("The interests of Emma Patten Casey and Lynn Patten Casey have been settled pursuant to a separate settlement entered into between the Trustee and each of them wherein their interests are avoided pursuant to 11 U.S.C. §§ 506(d), 544 and 548 and are preserved for the benefit of the Estate pursuant to 11 U.S.C. §551 in the amount of the debt owed.").

However, Henry's argument that avoidance under state law will always result in subordinate liens moving up ignores the difference in the results produced by avoidance under Subsection (a) versus Subsection (b) of Section 544. Subsection (a) of Section 544 of the Bankruptcy Code grants the power to a trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is avoidable by hypothetical lien creditors or hypothetical bona fide purchasers. Subsection (b) provides the same avoidance power but requires that a trustee step into the shoes of an actual unsecured creditor who could have avoided the transfer or obligation. While both subsections rely on state law rather than bankruptcy law for the cause of action, the status of the preservation of the lien vis-à-vis the remaining secured and unsecured creditors depends on which subsection the trustee pursues. Using the status granted to him under Subsection (a), a trustee could prove that an unperfected lien could be defeated by a bona fide purchaser or a judgment lien creditor whose execution was returned unsatisfied on the date the bankruptcy case was filed. The creditor holding the unperfected lien becomes an

6

unsecured creditor in the case, but the value of the lien is preserved for the benefit of the estate. The issue becomes more complicated if there are additional subordinate liens that were perfected and over which a hypothetical judgment lien creditor or bona fide purchaser could not take priority. As between other properly perfected creditors, the priority must still be determined for distribution purposes. In these circumstances, a subordinate lien holder might move up in priority. The Court previously cited in its Memorandum Opinion the *Graybeal* case, in which Judge Parsons reviewed what those circumstances were that allowed a junior creditor to move up. *Fugate v. Equity One, Inc. (In re Graybeal)*, No. 06-5008, 2006 WL 2401096, at *4 (Bankr. E.D. Tenn. Aug. 17, 2006) (Parsons, *J.*) (avoided lien retained priority because no pre-petition defect under state law had been alleged, and "a trustee only succeeds to the priority status of the lienholder whose lien has been avoided").

Henry cites *Skumpija v. Warren (In re Skumpija)*, No. 11-00338-8-SWH, 2013 WL 6092156 (Bankr. E.D.N.C. Nov. 19, 2013), which involved a failure to record as an instance when a second lien holder moved up to a first position. *See also Tenn. Mach. Co. v. Appalachian Energy Indus. (In re Appalachian Energy Indus.)*, 25 B.R. 515 (Bankr. M.D. Tenn. 1982) (failure to timely perfect a purchase money lien versus a properly perfected blanket inventory lien). However, there has never been an assertion that the Casey Creditors lien was unperfected.

The causes of action that the Trustee asserted in the settlement motion were state-law causes of action for recharacterization of debt to equity, implied partnership, or equitable subordination. These are causes of action available to creditors generally. Henry notes that any existing creditor could have brought such an action before the bankruptcy case commenced, under implied-partnership and debt-to-equity grounds. (Doc. No. 136 at 5.) The Court agrees. In

7

*Intertherm, Inc. v. Olympic Homes Sys., Inc.*, 569 S.W.2d 467 (Tenn. Ct. App. 1978), the case cited by Henry for the existence of Tennessee law on recharacterization, general creditors brought an action to avoid a security interest taken by insiders. The Court of Appeals recognized that loans between a corporation and its shareholders are legal in Tennessee. *Id.* at 471. It also recognized that "such transactions will invite the closest investigation by the courts, and must be characterized by the utmost good faith." *Id.* (internal quotation marks and citation omitted). The Chancery Court had found that the shareholder loans were actually contributions of capital and that to do otherwise would be to allow a fraud on creditors. *Id.* On appeal, the Court of Appeals reversed based on analysis of the sufficiency of the proof on certain elements but left no question that the cause of action was available for the general creditors.

Where Henry's argument fails is his assumption that, because the Casey Creditors' lien was reduced to equity, his lien is superior to preservation rights granted to the Trustee. He fails to consider that a cause of action available to creditors generally before bankruptcy belongs to a trustee after a bankruptcy filing. When the trustee is seeking to avoid a lien or obligation based on a state-law theory that is a remedy available to unsecured creditors generally, the trustee would employ Section 544(b). *See* Patrick A. Murphy et al., *Creditors' Rights in Bankruptcy* § 13:6 (2d ed. and 2021 Supp.) ("The general rule is that the trustee is the only proper party to maintain such action [under Section 544(b)], and that creditors have no right to intervene or bring one, at least absent a showing of the trustee's consent or failure to act.") (citations omitted). Where a cause of action is one available to unsecured creditors, Section 544(b)(1) preempts the rights of those creditors to bring that action and authorizes only the trustee to bring the cause of action. *See* 5 *Collier on Bankruptcy* § 544.06 (16th ed. and 2022 Supp.). Henry's argument that his lien moves

8

up is premised on the assumption that he somehow could still assert this fraud action to avoid the Casey Creditors' lien in the same way he could if the avoidance had occurred under Section 544(a). The Court finds that Henry could not do so because the action belonged to the Trustee for the benefit of all creditors. The preservation of the lien, therefore, is also for the benefit of the estate, and Henry is not entitled to a windfall.

The Court's conclusion is bolstered by the fact that the avoidance of a lien or obligation under state or federal fraudulent transfer law does not result in a subordinate lien holder moving up in priority. Henry acknowledges this rule. (Doc. No. 136 at 5.) Another basis for the avoidance under state law is a finding of implicit partnership. The case cited by Henry for this cause of action is *Jahn v. Lamb (In re Lamb)*, 36 B.R. 184 (Bankr. E.D. Tenn. 1983) (Kelley, *J.*). In that case, a Chapter 7 trustee sought to have a party who claimed to be a surety for one debt liable to all creditors as a partner. There were no liens avoided, but the trustee did obtain a judgment against the party found to be a partner pursuant to 11 U.S.C. § 723 for the total amount of the unsecured debt, less funds on hand in the estate. *Id.* at 189. In the other case cited by Henry in his reply, one of the plaintiffs seeking to recharacterize debts and have certain lenders declared to be partners was a Chapter 7 trustee. *McLemore v. Olson (In re B&L Lab'ys)*, 62 B.R. 494 (Bankr. M.D. Tenn. 1986). The partners were made liable for all the debts of the debtors. *Id.* at 508.

> Bankruptcy trustees use section 544(b) as a conduit to assert state law-based fraudulent conveyance actions in bankruptcy.
>
> \* \* \* \*
>
> Simply put, it is the trustee's responsibility to: (1) identify an existing creditor; (2) with an allowable claim; (3) who under non-bankruptcy law could avoid the transfer, at least in part. Once the trustee has proven his case, the trustee, pursuant to *Moore v. Bay*, 284 U.S. 4, (1931), as interpreted, may: (4) avoid the entire transfer (even if the creditor upon whom the trustee relies could avoid it only

9

in part); and (5) if necessary, recover the property transferred or its value under 11 U.S.C. § 550(a).

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 601–02 (B.A.P. 8th Cir. 2003) (citations omitted). Because a trustee is the only party who can bring causes of action under Section 544(b), Section 551 preserves the transfer or the avoided lien for the benefit of the estate, not for the individual creditor on whose claim the trustee relies to bring the Section 544(b) action.

Where the state law cause of action results in a benefit to all creditors, courts find that the lien avoided is preserved for the benefit of the estate. To the extent that Henry held a prepetition cause of action for implied partnership or recharacterization in his capacity as an unsecured creditor, upon the commencement of the Main Case, the Trustee was authorized to bring the action, not Henry. The Trustee is also authorized to settle it and to bind Henry. *In re Berg*, 376 B.R. 303 (Bankr. D. Kan. 2007). Unlike the priority battle between perfected and unperfected secured creditors after the avoidance of one creditor's lien under Section 544(a), the trustee's exercise of his powers under Section 544(b) does not leave a cause of action for Henry. To the extent that the Court's prior opinion leaves the impression that the Court's interpretation of *Retail Clerks Welfare Tr. v. McCarty (In re Van de Kamp's Dutch Bakeries)*, 908 F.2d 517 (9th Cir. 1990), required Henry to prove that he would be successful, the Court clarifies that he does not need to prove his claim in this situation because his right to pursue it was preempted.

### B. Manifest Injustice

Like clear error, the standard for manifest injustice is high:

> Essentially, a showing of manifest injustice requires that there exists a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy. The Sixth Circuit has made clear that the standard for manifest injustice is an exacting standard and that a successful Rule 59(e) motion must clearly establish a manifest error of law. Mere disagreement with a court's findings does not rise to the level

>of manifest injustice under Rule 59(e). The manifest injustice ground for a Rule 59(e) motion is not meant to allow a disappointed litigant to attempt to persuade the Court to change its mind.

*Hale v. Tennessee*, No. 3:14-CV-02194, 2021 WL 5867097, at *3 (M.D. Tenn. Dec. 10, 2021) (internal quotation marks and citations omitted). Reiterating arguments previously raised and "merely claiming that the Court misinterpreted the applicable facts and law" does not suffice to show manifest injustice. *Hewitt v. W. & S. Fin. Grp. Flexibly Benefits Plan*, No. CV 16-120-HRW, 2017 WL 2927472, at *1 (E.D. Ky. July 7, 2017) (internal quotation marks and citations omitted).

The essence of Henry's argument for manifest injustice is that, despite the actual language in the Motion to Approve the Settlement and the Court's order approving it, the Trustee actually entered into a settlement agreement to reduce the Casey Creditors' lien for the benefit not of the estate but rather of all of the subordinate lienholders, except Henry. To reach this conclusion, Henry argues that the settlement agreement was ambiguous and that, under contract law, the Court should look at how the Trustee acted after the settlement. Henry relies on the Trustee's post-settlement decision to pay at closing two creditors— Xylem Dewatering ("Xylem") and Neuhoff-Taylor Architects ("Neuhoff")—whose prepetition liens were recorded after his own. (Doc. No. 76 at 3; Doc. No. 124 at 5.) The Court, however, does not find the settlement agreement ambiguous. The settlement involved only the Casey Creditors, the Barge Cafe Creditors, and David Moss. The settlement agreement did not provide for the payment of any other creditor at closing of a sale other than the parties to the settlement. The settlement agreement expressly stated that the avoided portion of the Casey Creditors' liens were being preserved for the benefit of the estate. (Main Case, Doc. No. 374 at 3.) Henry objected to the settlement, but once the Court overruled him, he allowed the order to become final.

11

In the Motion to Alter or Amend, Henry poses the question, if the senior lien was avoided by $2 million, and the avoided amount was preserved for the benefit of the estate, why propose in the same settlement to benefit junior lienholders with those funds? (Doc. No. 124 at 2.) The settlement agreement answers that question. The junior creditors to whom Henry is referring are the Barge Cafe Creditors and David Moss. The Barge Cafe Creditors asserted a claim for $1.37 million, which they argued was secured. They also argued that their lien lis pendens was recorded prior to Henry's Deed of Trust. The Trustee obtained a reduction of their secured claim to $676,000 in exchange for a reduction and a release of all the other parties to the settlement. In addition, the Trustee received an assignment of their claims against Henry and David Moss. Their agreement to the settlement, and their release of all of the other parties, was part of the consideration for the concessions made by the Casey Creditors. Henry, above all other creditors, should have recognized the value of a settlement with the Barge Cafe Creditors, since his billing statements reflect hundreds of thousands of dollars of expense litigating with them in the Chancery Court of Hamilton County, Tennessee from 2008 to the date of the filing. Henry alluded to this litigation when he objected to the settlement. (Main case, Doc. No. 378 at 4.) The objection summarizes the history of that litigation and how Henry had been unable to bring the litigation to a conclusion by 2014, when the bankruptcy was filed. As for the other creditors, Henry expressly did not object to the payment of David Moss.

Henry correctly notes that the Trustee paid Xylem and Neuhoff. (Doc. No. 79-4 at 9 (Trustee cash receipts and disbursements record showing a payment of $19,934.21 to Xylem on July 16, 2018 and a payment of $8,900 to Neuhoff also on July 16, 2018)). The Court did not authorize these payments in either its order approving the settlement or the orders approving the

12

sale. The Court can find no other authorization for the payment. Should an action for disgorgement or some other claim related to the unauthorized payments be filed, the Court will consider the propriety of those payments and the Trustee's actions in making them. Given the Court's ruling that the lien was preserved for the estate and that there were no proceeds to which Henry's or any other subordinate lien could attach, the recovery of those payments may well be a problem for the Trustee and the recipients. However, the Court does not find that the existence of those two unauthorized payments should change the Court's prior ruling.

Accordingly, Henry has not met his burden to show either clear error or manifest injustice, and the Court will deny the motion to amend.

### III. TRUSTEE'S SUPPLEMENT REGARDING CLAIM 16 AND HENRY'S LEGAL FEES

In the Memorandum Opinion, the Court concluded that Henry was provisionally entitled to summary judgment on Count 3 of the adversary complaint. The Trustee did not sufficiently cite to the record to raise a question of fact about the proof of claim, Claim 16, that Henry filed in the Main Case for $1,232,403.41 of legal services that he performed for the debtor. The Court nonetheless gave the Trustee an opportunity to file supplemental papers "given the volume of material in the record that might support a genuine issue of material fact." (Doc. No. 116 at 43.) The Court anticipated that the Trustee would object to specific entries that he contends did not benefit the estate because they reflect work performed for Mr. Casey's benefit. The Trustee now has filed supplemental papers in further opposition to summary judgment. The Trustee's principal argument in the supplement against summary judgment for Henry on Claim 16 concerns ambiguities in Henry's itemized billing. To be allowed as a claim against the debtor's estate, Henry's proof of claim in the Main Case would have to be limited to legal services performed for

13

the debtor only. The Trustee, however, argues that Henry's itemized billing contains ambiguous time entries:

> In the bills provided to the Trustee, Henry uses the phrase "prepare documents" and "legal analysis and advice" with no description as to the subject of work. The phrase "prepare documents" is repeated **314** times and "legal analysis and advice" is repeated **456** times. Because Henry does not give a description of the subject or basis for the work, it is impossible to determine if the work hours billed were for [Allen] Casey personally or for the Debtor, or even if the work was performed. Henry also uses several different phrases to state that he had conferences with [Allen] Casey, but never described what these conferences were regarding. In some instances Henry stated "conference with [Allen] Casey regarding business matters" and others "conference with [Allen] Casey regarding business legal matters." However, Henry never mentions the Debtor specifically in these billing descriptions, nor does he reference any specific matter or transaction to which they relate. The vague descriptions totaled 1037.5 billed hours and a total of $378,728.50 billed.

(Doc. No. 132 at 2 (boldface in original).)

Procedurally, Henry believes that the Trustee's supplemental papers are not specific enough to raise a question of fact that would defeat summary judgment:

> As noted by the Court, the Trustee could have raised specific objections, and he had the opportunity to depose Mr. Henry regarding his billing to provide specific objections to the Court about Henry's billing. The Court has already reviewed Henry's billing statements and made the determination that the Trustee is the one who must provide specific objections not that the burden has somehow shifted to Henry to prove up his claim yet again.

(Doc. No. 135 at 3.)

The Court disagrees. The Trustee relies on Henry's admission that he represented both the debtor and Mr. Casey. In support of his assertion that the billings contained work for both, he relies on statements made at Henry's deposition on August 17, 2021. The Trustee's questions at the deposition included a review of each fact that Henry disputed in the joint statement of issues that the parties filed as part of the summary judgment motion proceedings. (Doc. No. 65.) The joint statement contained the following assertion from Emma Casey's estate:

14

> DISPUTED BY HENRY.  The only debt or obligation Henry has alleged or shown is the alleged prepetition debt for legal services provided by Henry to the debtor and/or Allen Casey.  There has been no substantiated basis for the allegation Emma Casey or her Estate agreed to pay Henry for anything at any time, pre or post petition.

(Doc. No. 65 at 14 ¶ 6.)  The Trustee sought clarification at Henry's deposition as to what Henry disputed in the above paragraph:

> Q.  Paragraph 6 on Page 14, "The only debt or obligation Henry has alleged or shown is the alleged prepetition debt for legal services provided by Henry to the debtor and/or Allen Casey."  Do you despite [sic] that?  There's two sentences there.  And what I was trying to find out was, do you dispute that statement?
>
> A.  I think that's correct.  It's probably the second sentence in dispute.

(Doc. No. 113-3 at 30.)  The Trustee interprets Henry's answer as an admission that Henry performed legal services for both the debtor and for Allen Casey individually.  This testimony and the lack of clarity in the specific entries identified by the Trustee give rise to a question of fact that will need to be determined at trial.  The Court has also searched the declarations of Henry for a clear statement that all of the time entries in his billings reflect work only for the debtor.  The Court has been unable to find such testimony.  Additionally, Henry appears to have used two different client accounts in his legal billing for Claim 16 both designated "Casey" without explaining why.  For this reason, the Court will deny Henry's motion for summary judgment as to those entries that only state "prepare documents" and "legal analysis and advice" with no description as to the subject of work and also entries for "conference with [Allen] Casey regarding business matters" and "conference with [Allen] Casey regarding business legal matters" provided Henry does not mention the debtor in these billing descriptions or the litigation or transaction to which they relate.  The vague descriptions totaled 1,037.5 billed hours and a total of $378,728.50 billed.  As to the remaining entries, the Court will grant the motion for summary judgment and allow

15

the remaining entries. Henry might be able to establish that all of the billing referenced in Claim 16 concerned services rendered for the debtor only, but that determination will have to await trial.

The Trustee's secondary argument against summary judgment for Henry on Claim 16 concerns interest. The parties do not dispute that Henry's legal billing includes interest charges of $219,860.68, out of a total bill of $1,232,403.41. There is no dispute that the amount of interest charged equates to an interest rate of 18%. The Trustee argues that the interest that Henry charged exceeded the maximum permissible interest rate under both Tennessee Formal Ethics Opinion 82-F-28 and Tennessee Code Annotated § 47-14-121. The Trustee would strike any interest above the maximum permissible rate but is amenable to allowing Henry to charge interest within the maximum. (*See* Doc. No. 132 at 4 ("Henry should be required to amend his claim to state with sufficient clarity the services he provided to the Debtor, and which includes an accounting for lawful interest charges.").)

Henry defends Claim 16 on several grounds. With respect to the interest rate charged, Henry reiterates his prior refutation of the Trustee's arguments to show that the Trustee has not raised any new issues. Specifically, Henry emphasizes that state law, by way of Tennessee Code Annotated §§ 47-14-121(c), 47-14-103, and 47-14-106, permit written contracts to set interest at any fixed rate as long as all parties receive appropriate notice and agree to the arrangement under ordinary principles of contract law. (*Id.* at 3–4.) In the alternative, Henry proposes that, in the event of a determination that he charged excessive interest, the rate should simply be lowered to a permissible rate.

The Court has an obligation to discount Claim 16 to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C.

16

§ 502(b)(1). The applicable law here begins with Tennessee Formal Ethics Opinion 82-F-28. Under Opinion 82-F-28, attorneys may charge interest on legal bills that are more than 30 days delinquent under certain conditions. The condition that is relevant here is a limit on the interest rate charged: The opinion states that "[t]he maximum effective rate of interest utilized in computing such interest shall not exceed the rate specified in TCA 47-14-121 as the rate of post-judgment interest." Tenn. Eth. Op. 82-F-28, 1982 WL 961504, at *1 (June 18, 1982).[1] The Trustee argues that the maximum rate is the post-judgment rate, while Henry argues that a subsection of Section 47-14-121 allows the attorney and his client to fix another rate by contract.

Section 47-14-121, as applicable under Opinion 82-F-28, allows legal bills to bear interest "at the rate so fixed" under the terms of the billing, but with one important outer limit: The interest cannot exceed "the limits provided in § 47-14-103 for particular categories of creditors, lenders or transactions." Tenn. Code Ann. § 47-14-121(c). Section 47-14-103, in turn, sets the maximum interest rate as "the applicable formula rate" for all written contracts not subject to some other explicit statutory maximum. *See* Tenn. Code Ann. § 47-14-103(2). The applicable formula rate is also defined by Tennessee law in section 47-14-102(3). It is "the greater of: (A) The 'formula rate' in effect at such time; or (B) The 'formula rate' last published in the Tennessee Administrative

---

[1] For the sake of the record, the Court notes that Opinion 82-F-28 did not refer to any of the current subsections of Section 47-14-121 because a different version of that statute was in effect in 1982, when the opinion issued. The version of the statute that was in effect in 1982 read as follows in its entirety:

> Interest on judgments, including decrees, shall be computed at the effective rate of ten percent (10%) per annum, except as may be otherwise provided or permitted by statute; provided, that where a judgment is based on a note, contract, or other writing fixing a rate of interest within the limits provided in § 47-14-103 for that particular category of transaction, the judgment shall bear interest at the rate so fixed.

Tenn. Code. Ann. § 47-14-121 (West 2007). The previous version was deleted in its entirety and replaced with the current version in 2012. Tenn. Pub. Acts Ch. 1043, H.B. 2982 (May 21, 2012).

17

Register prior to such time, pursuant to § 47-14-105." Tenn. Code Ann. § 47-14-102(3).  Finally, the "formula rate" means

> an annual rate of interest four (4) percentage points above the average prime loan rate (or the average short-term business loan rate, however denominated) for the most recent week for which such an average rate has been published by the board of governors of the Federal Reserve System, or twenty-four percent (24%) per annum, whichever is less; provided, that in the event that the board of governors ceases to publish the average rate, or in the event that the formula rate should be adjudicated or become inapplicable for any reason whatsoever, the formula rate is, and shall remain, twenty-four percent (24%) per annum until the general assembly otherwise provides.  If the board of governors fails to publish the average rate for four (4) consecutive weeks, it shall be deemed to have ceased to publish the average rate.

Tenn. Code Ann. § 47-14-102(7).  During the relevant time period when Henry and Casey fixed the rate in the note for the past due bills and the future advances were made, the Federal Reserve was publishing the average prime loan rate.  The Federal Reserve average prime loan rate from late 2008 through all of 2014 was 3.25%, which would have made the formula rate 7.25% under Section 47-14-102(7).  *See* Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates, https://fred.stlouisfed.org/series/PRIME (last visited July 5, 2022).  From 2010 into 2015, the Commissioner for the Tennessee Department of Financial Institutions published a formula rate of 7.25%.  Historical Listing of Formula Rates, https://www.tn.gov/tdfi/tdfi-how-do-i/info/formula-rate/formula-rate-history.html (last visited July 5, 2022).  Therefore, the applicable formula rate under either prong of Section 47-14-102(3) is the same, and the rate that will apply to Henry under Sections 47-14-121(c) and 47-14-103 will be 7.25%.

Here, the regulatory scheme summarized above requires a reduction in the interest rate that Henry can apply to his legal bills.  Henry was allowed to fix an interest rate under the terms of the billing, but Sections 47-14-121(c), 47-14-103, and 47-14-103(2) combined to set a maximum formula rate for each bill of 7.25%.  Because Henry never collected interest at the 18% rate that

18

he charged in the bills, the Court can simply conform his interest rate to the statutory maximum. *See In re Bogan*, 281 F. Supp. 242, 247 (W.D. Tenn. 1968) ("[A] contract cannot control the computation of interest or the time interest should run so as to increase the rate of interest beyond the legal maximum.") (citing *Dowler v. Ga. Enters.*, 34 S.W.2d 445, 446 (Tenn. 1931) (citations omitted)). Accordingly, when the final allowed amount for Henry's services is determined at trial, the Court will give the parties a chance to calculate the amount of interest allowed, applying a rate of 7.25%.

### IV.    TRUSTEE'S MOTION FOR FINAL JUDGMENT

The Court will discuss only briefly the Trustee's motion for a final judgment with respect to the avoidance of part of the Casey Creditors' liens under Section 551. (Doc. No. 126.) Henry does not object to the motion as long as his motion to amend the Prior Order is adjudicated first. (Doc. No. 137.) With the Court now having addressed Henry's motion to amend, the Court will grant this motion.

### V.    CONCLUSION

For all of the above reasons, the Court will rule as follows:

1)   The Court will deny Henry's motion to amend the Prior Order (Doc. No. 123).

2)   With respect to Henry's motion for summary judgment (Doc. No. 82) and Count 3 of the adversary complaint, the Court will grant the motion in part with respect to all time entries except for the entries including the following phrases: "prepare documents"; "legal analysis and advice"; "conference with [Allen] Casey regarding business matters"; and "conference with [Allen] Casey regarding business legal matters." The Court will deny the motion with respect to all time entries containing the above phrases; those entries will be addressed at trial. The Court also will grant the motion in part with respect to the applicable interest rate; upon final determination of allowable legal billing, the applicable interest rate will be 7.25%.

3)  The Court will grant the Trustee's motion for a final judgment with respect to the avoidance of part of the Casey Creditors' liens under Section 551 (Doc. No. 126).

A separate order will follow.

* * *