

**SIGNED this 5th day of March, 2024**

_____

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

In re:

**River City Resort, Inc.,**
      Debtor.

**No. 1:14-bk-10745-SDR**

**Chapter 7**

**Jerrold D. Farinash,** _Trustee_**,**
      Plaintiff,

**v.**

**James L. Henry, Jr.,**
      Defendant.

**Adv. No. 1:18-ap-01044-SDR**

## <u>MEMORANDUM OPINION</u>

**I.    INTRODUCTION**

      The plaintiff Jerrold Farinash, the Chapter 7 Trustee in this case, _In re River City Resort, Inc._, Case 1:14-bk-10745-SDR (the "Main Case"), asks the Court to find that defendant James L.

Henry ("Henry") committed contempt with respect to two orders entered by this Court.[1] The first order approves a settlement among the Trustee and parties other than Henry (the "Settlement Order"). The second order approves a sale of real property "free and clear of liens, claims, interests or encumbrances" to a limited liability company (the "Sale Order"). The issues in this proceeding require the Court to apply the standard for civil contempt discussed in *Taggart v. Lorenzen*, 139 S. Ct. 1795, 204 L. Ed. 2d 129 (2019). With respect to the Settlement Order, the Court must determine if the Trustee has shown by clear and convincing proof that the creditor had no "fair ground of doubt" that the order prohibited pursuit of his bankruptcy claim in a state court action. With respect to the Sale Order, the Court must determine whether the Trustee has shown by clear and convincing proof that the creditor had no "fair ground of doubt" that filing a lawsuit to recover his bankruptcy claim against the purchaser, despite the court's order that the property was sold free and clear of all liens and claims, was unlawful.

The Court has considered the evidence presented including the Joint Statement of Issues and Stipulated or Disputed Facts ("JSOIF") filed by the parties (Adv. No. 18-1044, Doc. No. 198), the exhibits[2], the trial briefing, the testimony at trial, and the additional testimony submitted by deposition at the end of the trial.

For the reasons discussed in this opinion, the Court finds that with respect to the Settlement

---

[1] The Trustee's complaint in this adversary initially included a count to subordinate Henry's claim, but the Court dismissed that count on summary judgment. (Adv. No. 18-1044, Doc. No. 117 ¶ 2.) The Trustee had also objected to the amount of Henry's claim. At trial, the parties announced that they reached an agreement to allow the claim at $1,000,000.00. Therefore, Court must now address only whether Henry's filing of the lawsuit and pursuit of a recovery on his bankruptcy claim was an act of contempt. The adversary proceeding went to trial on May 22 and 23, 2023, on this remaining issue.

[2] Pursuant to the Court's Scheduling Order (Adv. No. 18-1044, Doc. No. 195), the Trustee's trial exhibits were designated by letters and Henry's trial exhibits were designated by numbers. The Court has retained these designations in its references in this Memorandum. Some documents were offered by both parties and the Court has included both designations.

Order, as defined below, the Trustee did not carry his burden. The Settlement Order was not sufficiently specific and definite to put Henry on notice that further pursuit of his bankruptcy claim against Emma Casey ("Emma") and Lynn Casey ("Lynn") was unlawful. With respect to the Sale Order, as defined below, the Court finds the Trustee has carried his burden and that the Sale Order was specific and definite enough to put creditors on notice that their recovery would be limited to proceeds from the sale. Henry had no fair ground of doubt that an attempt to recover his bankruptcy claim from the purchaser, American River Development ("ARD"), would be unlawful. His complaint was an attempt to challenge not only the Sale Order, which limited his recovery against ARD to the sale proceeds, but the entire sale process with allegations of wrongful and fraudulent conduct by ARD. The Court will award compensatory damages to the Trustee for the expenses of bringing an action against Henry related to the period when Henry had a lawsuit pending against ARD. Accordingly, the Trustee's request will be granted in part and denied in part.

## II. BACKGROUND AND FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable by Federal Rule of Bankruptcy Procedure 7052, these are the Court's findings of fact following trial. The Court has written extensively on these matters in its Memorandum Opinions of March 31, 2022, and July 5, 2022. (Adv. No. 18-1044, Doc. Nos. 116 & 156.) Some of that information may be repeated here to put the Court's analysis in proper context.

### A. The Debtor and The Casey Creditors and their Bankruptcy Claims

Allen Casey ("Allen") has been the sole shareholder of the River City Resort, Inc. ("RCR" or "Debtor"), a Tennessee C-Corporation since 2001. (Adv. No. 18-1044, Doc. No. 198.) The Debtor's business plan was to develop the properties it accumulated along the riverfront on

Chattanooga's North Shore into a hotel, restaurant, condominiums, and retail. (*Id*. at 2 ¶¶ 5 & 8.) However, at the time of the Debtor's bankruptcy, the properties were vacant land designated as Lots 1[3], 4, and 5 (plus a dilapidated river barge moored alongside). The Court will refer to the three lots as "the Properties". The Properties did not generate income. (*Id*. ¶ 8.) Allen's wife Emma, and his daughters, Lynn and Elizabeth, provided funding to Allen and the Debtor. Whether that funding was a loan or an equity contribution became a major issue in the case because the funding was secured by liens against the Properties filed prior to the liens of other creditors (including, Henry). Separate claims totaling $5,599,889.97 were filed by Emma, Lynn, and an entity named Heavens No, LLC (owned by those family members), (collectively the "Casey Creditors"). The details follow:

1. Lynn filed Claim 27, asserting a balance of $415,194.02, evidenced by a promissory note for $350,000.00 dated October 19, 2009, and a Deed of Trust on Lot 1 of the Properties. The Deed of Trust was signed on October 20, 2009, and recorded on October 23, 2009. (Main Case, Claim 27-1, 27-2, & 27-3; Trial Ex. X.)[4]

2. Heavens No, LLC, filed Amended Claim 28, asserting a balance of $1,846,574.76, evidenced by a promissory note dated November 21, 2007, and a Deed of Trust on Lot 1 of the Properties that was signed and recorded on November 21, 2007. (Main Case, Claim 28-1 & 28-2; Trial Ex. Y.)

3. Emma filed Claim 29, asserting a balance of $3,301,388.44, evidenced by promissory

---

[3] Cornerstone of River City Resort, LLC ("Cornerstone") is the owner of Lot 1. It filed a Chapter 7 proceeding on January 15, 2016. (Case No. 1:16-bk-10182-SDR.) The Court entered an order for joint administration with the Debtor on February 26, 2016. Cornerstone is a wholly owned subsidiary of the Debtor.  (Main Case, Doc. No. 83 at 2; Trial Ex. 3.)

[4] Lynn's claim was amended twice. The final claim amount was $451,926.77.

4

notes dated April 5, 2004, for $502,569.31; November 9, 2004, for $1,100,00.00; and October 19, 2009, for $650,000.00. The obligations were secured by Deeds of Trust on all three of the lots. They were recorded on April 14, 2004; November 12, 2004; and October 23, 2009,[5] respectively. (Main Case, Claim 29-1, 29-2, 29-3; Trial Ex. Z.)

### B.  Henry's Bankruptcy Claim

Between 1991 and the filing of the Debtor's petition in 2014, Henry provided legal services to the Debtor and its predecessor entities and affiliates. In late 2003, Henry received a payment of $471,000 for his legal services from the Debtor. (Adv. No. 18-1029, Doc. No. 136 at 3 ¶ 22.) Henry contended this payment actually came from Emma, who provided a guaranty to Debtor's bank to obtain the loan which funded the payment. (Adv. No. 18-1029, Doc. No. 15-1 at 7 & 9 ¶¶ 26, 28, & 42.) No other payments to Henry for his legal services were identified as coming from Emma. In fact, it does not appear there were any other payments to Henry for his services after that 2003 payment.

In 2011, Henry again obtained a promissory note in the original principal amount of $182,728.32, signed by the Debtor, Cornerstone, and Allen personally. (Main Case, Claim 16-2, Part 3 at 1; Trial Ex. G.) The note provided for advances and accrued interest at the rate of 18%.[6] The promissory note contained language that, at Henry's option, the note would become payable immediately if either the Debtor or Allen filed for bankruptcy. (*Id.* at 1–2.) Henry required the promissory note and Allen's guaranty as security for the payment of his fees. The promissory note to Henry was secured by a pledge of the Properties. The pledge was evidenced by a deed of trust

---

[5] The October 23, 2009 Deed of Trust addressed both Lynn's promissory note and Emma's third promissory note. The document reflects that it was drafted by Henry. (Main Case, Claims 27 & 29; Trial Ex. X & Z.)

[6] The Court previously determined the contractual interest to be excessive and reduced it to 7.25%. (Adv. No. 18-1044, Doc. No. 156 at 18; Doc. No. 157 at 1–2.)

on the Properties recorded on January 12, 2012.

No other Casey Creditor signed this note, nor did Emma, Lynn, Elizabeth, or Heavens No, LLC sign a separate document as a guarantor. Henry presented no written evidence at trial that any of the Casey Creditors assumed any liability, individually or as a partner through some other entity, for RCR's debt to him or for Allen's guaranty of RCR's obligations.

In fact, Henry testified he never received a direct statement from Emma that she would be responsible for his fees. (Trial Ex. 25, Henry Dep., 26:19–27:1.) Henry testified that he never asked Emma for a guaranty. (*Id*. at 93:2–5.) Nevertheless, one of his defenses to these contempt claims is that he was pursuing Emma based on a contract claim. He maintained that"[p]rior to the petition date, Emma had constantly promised Henry that his bill would be paid whenever RCR's properties were sold." (Adv. No. 18-1044, Doc. No. 198 at 3 ¶ 19.) There was no testimony at trial elaborating on these "promises," their frequency, or how the sale of the Properties operated as a condition to payment.

Henry's claim of a contractual arrangement with Emma relies entirely on representations made to him by Allen. Despite contending that Emma gave deposition testimony in the Barge Café Litigation in which she expressed promises that he would be paid when the properties sold (Trial Ex. 25, Henry Dep. at 29:2–6), Henry did not offer Emma's deposition in support of his claims. Furthermore, in the years that passed between the filing of the Debtor's bankruptcy and this litigation, he never requested admissions or a clarifying deposition from Emma to support his contract theory. Ultimately, this court concludes that the  "constant promises" came only from Allen. Henry assumed Allen could ensure payment of the legal fees because Allen was repeatedly able to obtain funding from Emma for the Debtor's projects. (*Id*. at 25:18–26:18.) Henry admitted

that he did not always believe Allen; he explained Allen was diagnosed as having a "narcissistic disorder." (*Id*. at 27:2–8.) Henry described Allen as "[s]o, he gets up every morning and whatever he thinks is reality for the day—I mean, you know, he can reconstruct his own reality." (*Id*. at 27:8–11.) According to Henry, Allen told him Emma was motivated by a desire to restore the family name after Allen's prior business failings, and she was also dependent on Allen to administer her life-saving insulin shots. (*Id.* at 66:5–15 & 67:25–68:11.) Despite what the Court sees as a list of red flags, Henry testified he believed the representations of an otherwise untrustworthy Allen that Emma would continue to fund the project to maintain control. (*Id*. at 27:2–8.)

Henry's fees for the period from 2011 to the date of the petition included substantial services rendered in connection with his representation of the Debtor in litigation in the Chancery Court of Hamilton County, Tennessee with River City Barge and Café, LLC; River City Barge Company, LLC; John Winesett, Barbara Winesett, David Debeter, Roy Roach, and Gregory Hellwig, (collectively referred to as the "Barge Café Creditors"). (Trial Exs. A–F.) On the eve of the trial in the Chancery Court, the Debtor filed its voluntary petition (originally in Chapter 11) on February 24, 2014, effectively staying the Chancery Court proceeding. Prior to the bankruptcy filing, the Barge Café Creditors filed a lien lis pendens against some of the Properties.

After the bankruptcy was filed, Henry filed an Amended Claim 16 (the "Legal Fee Claim") on June 30, 2014. (Main Case, Claim 16-2; Trial Ex. G.) Henry asserted that he was owed $1,232,069.07. This amount included the note's original principal balance, charges for legal services performed after execution of the note in 2011, and accrued interest. Henry asserted that the entire claim was secured by the Properties.

7

### C.  Trustee's Settlement with the Casey and Barge Café Creditors

During his appointment in the chapter 11 case and his reappointment following the case's conversion to a chapter 7, the Trustee sought to sell the Properties. Concluding that complicated title issues and competing equitable claims would hamper any sales effort, he decided that the Properties could not be sold without the consent of lienholders. These lienholders and Barge Café Creditors would not consent unless they could conclude their years-long litigation. To that end the Trustee obtained consents where he could and sought settlements for the estate with the others. In 2016, the Trustee reached a settlement with the Barge Café Creditors, the Casey Creditors, and David Moss. Mr. Moss had performed services for the Debtor in the Barge Café litigation and, like Henry, had received a deed of trust to secure his debt. The Trustee filed a motion on September 26, 2016 (the "Settlement Motion"), asking the Court to approve a compromise and settlement with those parties who claimed liens encumbering the Properties. Part of the settlement included a contribution of an additional lot adjacent to the Properties (referred to as "Lot 3") owned by Trinity Hotel Partners, LLC, another affiliate of the Casey Creditors. (Main Case, Doc. No. 374; Trial Exs. 8 & I.) The Trustee asserted that the Casey Creditors' claims "are or should be considered equity, rather than debt, pursuant to theories of either equitable subordination, re-characterization of debt to equity, or implied partnership." (*Id.* at 2 ¶ 3.) The settlement was described as follows:

> In order to effectuate a sale of the Property, to generate the proceeds that will ultimately fund this agreement, Trinity Hotel Partners, LLC agrees to quit claim its interest in 416 Manufactures [sic] Road, Chattanooga, Tennessee to the Bankruptcy Estate of River City Resorts, LLC, to be administered as property of the estate, pursuant to 11 U.S.C. § 541, for purposes of a sale.  Trinity Hotel Partners consents that 416 Manufactures Road is property of the Estate; the liens underlying claims of Lynn P. Casey (claim 27), Heavens No, LLC (claim 28) and Emma P. Casey (claim 29), are set aside pursuant to 11 U.S.C. §§ 544, 545, 548 and 550 for the benefit of the Bankruptcy Estate of River City Resorts, LLC, pursuant to 11 U.S.C. § 551; and the Casey Creditors assign, to the Estate, any and all of their claims

against James L. Henry, Jr., David L. Moss and the Barge Café Creditors.

In exchange, the Estate will pay the Casey Creditors the sum of $3,575,000.00.  The Casey Creditors will be permitted to assert an unsecured claim for any additional sums they claim are owed, upon proper amendment to their current claims.  Nothing in this settlement shall prohibit the Trustee, or any creditor, from disputing the amount or validity of the remaining unsecured claim(s), asserted by the Casey Creditors. **In addition, the Estate, on behalf itself and of all of its creditors, releases the Casey Creditors from any and all claims that they would possess against the Casey Creditors under 11 U.S.C. § 541, 542, 544, 547, 548, 549 and 550 ("Casey Release").**

(*Id.* at 3 ¶ 6 (emphasis added).) In the language defined as the "Casey Release", the Trustee did not repeat his theories of equitable subordination, recharacterization and implied partnership. Nor did he refer to Bankruptcy Code sections 510 (Subordination), 105 (Power of court) and 723 (Rights of a partnership trustee against general partners) in the list of enumerated Bankruptcy Code Sections under which he or creditors might possess claims which were being released. Consequently, the omission of specific code sections combined with the  generalized language in the motion resulted in ambiguity about the basis for the claims being released.

### D.  Henry's Objection to the Settlement

Henry was not one of the parties to the proposed settlement, but he was a creditor; and the Settlement Motion stated that the Trustee was releasing the Casey Creditors on the behalf of the estate and "all of its creditors." (*Id.* at 3 ¶ 6.)

Henry objected to the Settlement Motion on October 17, 2016 (the "Settlement Objection") but did not complain about the "all of its creditors" language. (Main Case, Doc. No. 378; Trial. Ex. 9.) He contended the proposed settlement was not fair and equitable: (a) because some creditors such as the Barge Café Creditors, whom the trustee proposed to pay under the settlement terms, did not have proper liens; (b) because some claims being paid were barred as untimely; and (c) because some claims—namely the Casey Creditors' claims—were wholly based in equity and

9

thus should be subordinate to his own lien.  (*Id.* at 15.)

Specifically, Henry objected to allowing the Casey Creditors' claims in any amount because he asserted those claims: (a) had been satisfied, (b) could be avoided for lack of consideration, or (c) should be considered equity contributions made by implied partners and/or recharacterized as equity. Henry referred to Emma as the "capital partner" of the family partnership, whose loans to the Debtor should be recharacterized as equity under existing law. (Main Case, Doc. No. 378, Trial Ex. 9 at 2 ¶¶ 4(b)–(d).) In short, Henry's objection alleged in detail how Emma and other members of the Casey family funneled money to Allen, who in turn put those funds into the Debtor without any of the customary lender expectations of repayment. Instead, the Casey Creditors' repayment would occur in the future as a return from the commercial success of the Debtor's development of the Properties. The Casey Creditors' claims, therefore, were equity instead of debt, despite the existence of promissory notes that were created to give an outward appearance of debt.

This is perhaps the most credible portion of Henry's theory; Henry knew that the equity was disguised as debt because he, himself, had been the architect of that plan. In Henry's deposition, he takes credit for ensuring that the Casey Creditors even had a debt argument. Henry testified that he was the one who told Allen that Emma needed to document her advances to Allen as debt. (Henry Dep., Trial Ex. 25 at 14:10–15:18.) Henry was also the attorney who drafted the Deed of Trust for Emma and Lynn, which was the first lien on  Lot 1 of the properties. (Main Case, Claims 27-2 Part 2 at 3 & 29-1 Part 2 at 22; Trial Exs. X & Z.) The irony, therefore, is that it was Henry's recommendations to create the debt structure that his objection sought to discredit.

There is no denying an overlap between Henry's Settlement Objection and the Trustee's description of potential controversies. Essentially, they agreed upon the potential causes of action but diverged on how much further to pursue them. The Trustee chose to settle the claims and seek a sale of the Properties rather than to pursue complicated and prolonged litigation. (Main Case, Doc. No. 374, Trial Ex.

10

8 & I at ¶ 12.)

Notably, Henry's Settlement Objection did not raise an issue with respect to the Trustee's standing
to release the claims based upon implied partnership and recharacterization for the estate and all of its
creditors. Furthermore, the objection sought no clarification that his claims based on an implied partnership
(of which Emma was the capital partner) were different from Trustee's claims. Henry did not assert he had
"individual claims" that the Trustee could not settle without his consent. Rather, Henry's objection was
focused on the extent of the trustee's recovery based on the level of family involvement in funding.

### E. Barge Café Creditors Reply to Henry's Objection to the Settlement Motion

The Barge Café Creditors filed a reply to Henry's Settlement Objection on November 2, 2016.
(Main Case, Doc. No. 382.) The response detailed years of disputes and litigation related to the
river front project. The Barge Café Creditors asserted they held a valid lien on the Properties and
that the doctrines of revival and equitable estoppel would negate any statute of limitations defense
Henry raised in his objection to their right to recovery. (*Id.* at 19–21.) Nonetheless, they
acknowledged that litigating their rights would take a long time and would be expensive, which is
why they decided to become a party to the settlement which they described as fair and reasonable.
The settlement assigned their causes of action (including those against Henry and Emma) to the
Trustee, stating:

> Pursuant to the proposed settlement agreement with the Trustee, the Barge & Café
> Creditors are assigning their cause of action against Henry to the Trustee. They are
> also assigning their cause of action against Emma Casey, another creditor, to the
> Trustee and there are Tolling Agreements in place with respect to both causes of
> action against Henry and Emma Casey. The Barge & Café Creditors also expect to
> elicit testimony from the Trustee that will explain why the settlement agreement,
> including the assignment of the Barge & Café Creditors' claims, is in the best
> interest of the estate and other creditors. Pursuant to the standard for approving
> compromises, this Court does not need to decide the validity of the Barge & Café
> Creditors' claims, but simply needs to decide if the settlement agreement is fair and
> equitable in light of several factors. As set forth in this Brief, the Barge & Café
> Creditors firmly believe not only that their claims are valid, but that in all likelihood

> they will be successful in pursing them, although at significant expense,
> inconvenience and delay for Debtors'[sic] bankruptcy estate.

(*Id.* at 24.) Unlike the Barge Café Creditors, Henry never expressly assigned any of his potential

claims against the Casey Creditors to the Trustee.

### F. Hearing on the Settlement Motion

A hearing was held on the Settlement Motion on November 3, 2016.  The Trustee testified he

intended to resolve all of the creditors' claims and had almost succeeded, but he could not resolve

Henry's claim.  (Main Case, Doc. No. 435 at 21:14–24; Trial Ex. U.) He also testified that he was

familiar with the allegations made in Henry's objection and in the Barge Café Creditors' response.

(*Id*. at 21:14–16.)

The release of Emma Casey and the other Casey Creditors was discussed several times at

the hearing. Counsel for the Barge Café Creditors confirmed in his examination of the Trustee that

the Casey Creditors were receiving a release from the Barge Café Creditors. (*Id*. at 22:19–23:7.)

The Trustee responded:

> I would say that that's likely to be the single most important factor in their
> considerations, was that this puts an end to all of the litigation that involves Mrs.
> Casey, Mrs. Emma Casey. It was, based in my interactions with her personally and
> her daughters and their lawyers, it, I believe that to be probably one of the most
> important aspects of the settlement. And that's a release I could not give her.  I
> could not release the individualized claims of the Barge Café Creditors against Ms.
> Casey. I could release generalized claims, but I could not release those
> individualized claims.

(*Id.*) The Trustee went on to explain the nature of his claims against the Casey Creditors:

> The other thing that has to be considered in the Casey litigation is there would not
> only be attorney's fees, but the basis of our claim, as Mr. Henry has outlined in his
> objection, would be implied partnership or a, or an outright partnership. And I think
> there would be accounting costs in that because the accounting aspect of that, I
> think would only bolster our case….

(*Id.* at 24.)

12

The Trustee testified that, if needed, he believed that he could prevail against Emma and Claim 29 by recharacterizing the claim as equity under a theory of implied partnership. (*Id.* at 28:22–29:12.) However, he also believed in a likelihood of success against Emma alone. Establishing an implied partnership across multiple corporate entities associated with the Casey family would prove too difficult, which was why the Trustee preferred to settle rather than jeopardize any recovery for the estate. (*Id.* at 29:13–24.) The Trustee wanted to sell the Properties and Lot 3 together because he felt sure the four adjacent lots would have more value if sold together. (*Id.* at 35:16–18.) Also, the Trustee reasoned that a settlement and sale of all four lots would avoid appeals and further litigation. (*Id.* at 40:1–41:16.)

During Henry's cross-examination of the Trustee, the Trustee clarified that the Barge Café Creditors' allegations against Emma involved fraud. (*Id.* at 33:1–3.) The Trustee continued:

> "The Barge Café Creditors would not own the right to have [Emma] declared an implied partner as I, the Trustee, have that right because that's a generalized claim and I could release that as, upon Court approval, I could release those claims. Because they are generalized claims."

> Henry responded, "Okay."

> The Trustee continued, "What as [T]rustee I cannot release are individualized claims."

> Henry responded, "I see."

(*Id.* 11–15, 16, 17–18.)

If Henry disagreed with the Trustee's position on his settlement ability, he did not indicate any opposition at the hearing. Although there were several other references to the release of the Barge Café Creditors' claims, the Trustee made no other specific reference regarding his release of the claims of all other creditors such as Henry. This is perhaps because Henry had not indicated at any time prior that he believed he had an individual claim against Emma based on direct

13

representations she allegedly made to him. At that time, his only stated theories were those he expressed in his objection—an implied family partnership theory and/or recharacterization. The Trustee did not discuss the release as to non-settling parties, but there were several points in the Trustee's testimony where the Trustee referenced the Barge Café Creditors as creditors granting a release without elaborating on exactly what claims were being released. (*Id.* at 40:17–41:19 & 57:2–9.) The Trustee explained he had to obtain the release from the Barge Café Creditors because they intended to pursue Emma on individual fraud claims, and she would not settle without an end to any litigation involving her. (*Id.* at 33:19–34:7.)

The Court's review of the testimony at the hearing does not provide clear and convincing evidence that the Trustee's settlement foreclosed all claims against the Casey Creditors. In fact, the discussion about the necessity of the Barge Café Creditors' participation in the settlement indicates there were claims that the Trustee could not resolve without a release. Although the testimony at the hearing helps clarify that Henry was aware that the Trustee was intending to settle all claims based on an implied partnership theory, that clarification did not make it into the Settlement Order.

### G. The Settlement Order

Following the hearing, the Court issued an oral opinion acknowledging the complicated and expensive history between the settling parties. The Court overruled Henry's objection and granted the Settlement Motion, finding that the settlement was in the best interest of the estate. (*Id.* at 81:6–9.) Henry did not seek reconsideration of the Settlement Order, nor did he appeal the overruling of the Settlement Objection. The Court's approval was memorialized in an order entered on November 7, 2016, prepared by the parties to the settlement (the "Settlement Order").

14

(Main Case, Doc. No. 393; Trial Exs. 10 & I.) The Settlement Order itself did not contain any release or injunctive language directed to non-settling creditors regarding their claims. It was a short order that incorporated the terms contained in the Settlement Motion[7] The motion, in turn, incorporated a settlement agreement, an unexecuted copy of which was attached as an exhibit. (Main Case, Doc. No. 374 at 8–15.) The Court added language to the proposed order drafted by the parties stating, "the Trustee is authorized to enter into the settlement agreement which was attached to the [Settlement] Motion." (Main Case, Doc. No. 393; Trial Exs. 10 & I at 1.)

Because of the incorporation of the terms "set forth" in the Settlement Motion, the Court has reviewed that motion and the documents referenced therein to see if there were other provisions clarifying what claims could no longer be pursued. The Settlement Motion contained the language defined as the Casey Release. (Main Case, Doc. No. 374 at 3 ¶ 6.) It clarified that the Casey Release applied to all of the estate's creditors, but the release applied only to claims they possessed under 11 U.S.C. §§ 541, 542, 544, 547, 548, 549, and 550. (*Id.*) The only other document that could have provided the needed specificity was the settlement agreement, by its incorporation. Paragraph 11

---

[7] The order did make one modification which does not impact the court's analysis. The settlement agreement referred to in Paragraph 3 of the Settlement Motion provided that the unsecured claims of the creditor parties to the settlement would be allowed upon consummation of the sale of the Properties pursuant to the terms of the escrow agreement.  (Main Case, Doc. No. 374 at 13 ¶ 3; see also Trial Exs. 8 & I.) The exception noted in the Settlement Order was that this term was changed. The unsecured claims of the parties to the settlement agreement were allowed with the entry of the Settlement Order rather than upon consummation of a sale; and the right to make further objections to those claims, which had been reserved in the Settlement Motion, was deleted. Specifically, the order provided that:

> [T]he following language in Paragraphs 6 and 8 is deemed deleted from the Motion and the unsecured claims as set forth in Paragraph 3 of the Settlement Agreement attached to the Motion are deemed allowed and not subject to further objection: "Nothing in this settlement shall prohibit the Trustee or any creditor from disputing the amount or validity of the remaining unsecured claim(s) . . ."

(Main Case, Doc. No. 393 at 2 (emphasis in original); Trial Exs. 10, J.) This change did not provide any further clarity regarding what non-settling creditors could or could not do.

of the Settlement Motion provided that the settling parties would enter into the proposed, detailed settlement agreement attached as Exhibit 1 [to the Settlement Motion] upon Court  approval. (*Id.* at 5 ¶ 11; Trial Exs. 8 & I.) An executed copy of the agreement was never filed with the Court or offered at trial.

The form alone is not helpful, as the Casey Release does not appear in the settlement agreement exhibit. In fact, the exhibit does not contain a specific release paragraph—despite its paragraph 6 stating that the "covenants, promises, releases and other agreements set forth herein" reflected mutual compromise and constituted a mutual exchange of valuable consideration. (*Id.* at 13.) The attached settlement agreement exhibit did not provide any additional notice that non-settling parties could no longer pursue bankruptcy claims against the parties to the settlement. The premises of the settlement agreement recited the existence of liens of record on Lots 1, 3, 4, and 5. Henry's lien was expressly noted, but that is the extent of a reference to Henry. One of the premises stated the settlement parties desired to have the lots "sold free and clear of all liens, claims, encumbrances and ownership interests, subject to the terms and conditions of this Agreement and the Escrow Agreement (as that term is defined hereafter)." (*Id.* at 11.) The agreement also recites the parties' "desire to release and fully discharge all claims and demands that any of the Parties may now or hereafter have against any other of the Parties arising out of or directly or indirectly related to any of the Properties, except for those claims that are listed in Section 3 below. (*Id.* at 12.) "Parties" is defined not as all parties, but as "all of the parties to this [Settlement] Agreement." (*Id.* at 11.) The settlement agreement exhibit does not address its impact on non-settling parties or the creditors on whose behalf the Trustee was acting.

While there may be other documents contemplated by the settlement parties that could

16

include more extensive release language and prohibitions against further actions, they were not

made part of the record. For example, paragraph 1 of the settlement agreement commits the Parties

to enter into an escrow agreement into which they would deliver the instruments, documents, and

court orders that would be necessary for:

> (a) the Trustee to be able to sell the Properties free and clear of all liens, claims and
> encumbrances and ownership interests of the Casey Creditors, Barge Café
> Creditors and Moss[;]
> (b) the assignment by the Parties to the Trustee of the liens and encumbrances that
> the Parties may have with respect to any of the Properties[;] and
> (c) the release and full discharge of the claims of the Parties described above arising
> out of or directly or indirectly related to any of the Properties, upon the satisfaction
> of the conditions provided in the Escrow Agreement, including, without limitation,
> the payment to the Casey Creditors of $3,575,000.00, the payment to the Barge
> Cafe Creditors of $675,000.00 and the payment to Moss of $70,000.00.

(*Id*. at 12 ¶¶ 1–1(c).) The forms of the Escrow Agreement and any instruments or documents to be

delivered, if they were prepared, were not exhibits to the Settlement Motion. Consequently, they

were not part of the package served on creditors. If a more comprehensive release document exists,

the Trustee did not present it at trial. Neither the Settlement Order, the Settlement Motion, nor the

exhibit specifically describe the impact of the settlement on implied partnership or

recharacterization claims held by non-settling parties.

### H.  *Sale of the Properties, Henry's Consent Order, and the Sale Motion and Order*

Prior to filing the Settlement Motion, the Trustee laid the groundwork for a sale of the

Properties by obtaining consent orders from some of the lien creditors. Henry was one of them.

On February 26, 2016, at the request of the Trustee and Henry, the Court issued an agreed order

that memorialized Henry's consent to a sale of the Properties (the "Consent Order"). (Main Case,

Doc. No. 308.) The Consent Order contained the following reservation of rights for Henry:

> The Creditor does not waive the right to **object** to any sale based upon the amount
> of the sale or, after consummation of the sale, the right to **object** to a failure to

allocate or improper allocation of the sale proceeds among the lots described in the Deed of Trust recorded at Book 9554 Pages 195–200 in the Hamilton County Register's Office. Nothing in this Order prevents Creditor from **objecting** at any time to the claims of other creditors and/or to any other action taken by Trustee in this case, including, without limitation, **objections** to Trustee's proposed settlements with other creditors or third parties. **All valid and perfected liens will attach to the proceeds from any sale of the Property approved by the Court.**

(*Id.* at 1–2 (emphasis added).) The Consent Order was clear that Henry could object to other creditors' claims and settlements and that his liens attached to proceeds from any sale approved by the Bankruptcy Court. As the language in the Consent Order identified Henry's retained right— the right to object to other creditor's claims—the Bankruptcy Court was always envisioned as the locus for exercising his right.

On July 1, 2016, prior to filing the Settlement Motion, the Trustee filed an Expedited Motion to Sell the Properties plus Lot 3 and for Stalking Horse Protections and Procedures (with attached proposed "Bidding Procedures Order"). (Main Case, Doc. No. 341.) The Notice and Motion did not address the rights of any specific creditors beyond the comprehensive statement that the parcels to be sold:

> "will be transferred free and clear of all liens, claims, encumbrances and interests of any other person or entity receiving notice of this sale, including any entity claiming a secured interest in the property, any governmental entity claiming against the property other than property taxes which will be paid at closing. Valid and perfected liens, claims, encumbrances and interests (as later determined by the Court) shall attach to the sale proceeds."

(*Id.* at 4 ¶ 28.) The Bidding Procedures Order entered on July 28, 2016, (Main Case, Doc. No. 356), contained a provision that the failure to file a timely objection to the sale would act as:

> "a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale contemplated by the Purchase and Sale Agreement or any other offer, including the transfer of the Estate's assets to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests."

18

(*Id.* at 5.) CW Development Company, LLC was the original approved buyer for $5,925,000; however, this sale did not close. The Trustee filed another motion to sell the Properties and Lot 3 for $5,925,0000, this time to KCB Operations, GP, on February 20, 2017. (Main Case, Doc. No. 404). The second motion was approved on March 24, 2017 (Main Case, Doc. No. 414). That sale also failed to close.

On October 19, 2017, the Trustee filed a third motion to sell the Properties plus Lot 3 to ARD at the lower price of $5,200,000 (the "Sale Motion"). (Main Case, Doc. No. 425; Trial Exs. 6 & K.) The Trustee reserved his right to select a higher and better bidder to present to the Court for approval at the hearing on the Sale Motion. The Sale Motion included the following provisions:

> 15) Transfer Free of All Liens and Liabilities to Seller. The Property will be transferred free and clear of all liens, claims, encumbrances and interests of any other person or entity receiving notice of this sale, including any entity claiming a secured interest in the property, any governmental entity claiming against the property other than property taxes which will be paid at closing. Valid and perfected liens, claims, encumbrances and interests (as later determined by the Court) shall attach to the sale proceeds. Buyer will not assume any liabilities or obligations of or relating to the Property.

> 17) Conditions. The only conditions to closing will be: (1) the Property will be sold to Buyer pursuant to an order entered by the Court, under 11 U.S.C. § 363; (2) the Trustee must be able to provide insurable title to the property; and, (3) the absence of any material adverse change with respect to the Property.

> 33) In this matter, Buyer is unwilling to purchase assets from the Debtor, supposedly free and clear of claims, liens, rights, interests and encumbrances only to be forced to repeatedly relitigate the issue with the individual claimants after the sale is completed. Accordingly, any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of this Chapter 7 case.

(*Id.* at 4 ¶¶ 15, 17–15 ¶ 33.)

By the date of the hearing, a better offer had materialized, and the Court granted the Sale Motion by an order entered on November 21, 2017 (the "Sale Order"). (Main Case, Doc. No. 443;

19

Trial Ex. L.) The new purchaser was to be Halvorsen Suburban Centers, LLC for $5,500,000 with ARD agreeing to be a backup purchaser in the amount of $5,200,000 should Halvorsen not close. Ultimately, Halvorsen did not close. ARD increased its bid to $5,500,000 at closing and purchased the Properties and Lot 3. The parties did not return to court to memorialize the changes since the contingency for ARD to be the backup bidder was addressed in the Sale Order.

The Sale Order approved the sale of the Properties and Lot 3 "free and clear of all liens, claims, rights, interests and encumbrances of any party receiving notice of this sale, with all valid, and perfected liens, claims, rights, interests and encumbrances, as later determined by the Court, to attach to the net proceeds of sale." (*Id.* at 5 ¶ 17.) The Sale Order did not elaborate further on the issues and litigious claimants mentioned in paragraph 33 of the Sale Motion, but that paragraph made very clear that "any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of this chapter 7 case." (Main Case, Doc. No. 425 at 15 ¶ 33; Trial Exs. 6 & K.)

The Court finds there is nothing inconsistent between the Sale Motion and the Sale Order. Creditors were given notice that the buyer was assuming no obligations relating to the Properties and to Lot 3. Further, the claimants' only source of recovery from the buyer for the satisfaction of their claims would be the sale proceeds, and disputes would be resolved in the Chapter 7 case. The contract for purchase and sale also contained a provision in which the Trustee warranted that he had Bankruptcy Court authority to convey the Properties free and clear of liens. (*Id.* at 15 ¶ C.)

Henry received notice of the Sale Motion and the Sale Order through the notice of electronic filing in the CM/ECF system (Main Case, Doc. Nos. 374, 443; Trial Exs. 8, I & L) and

20

through the Bankruptcy Noticing Center (Main Case, Doc. No. 444). Henry complied with the
Consent Order he signed and did not object to the sale. He did not seek any clarification about who
the buyer was, nor did he seek clarification about whether he could pursue his Legal Fee Claim
against the buyer or its principals outside of the Chapter 7 case. He did not appeal the Sale Order.
The sale closed on February 9, 2018, as announced in the Trustee's Report of Sale (Doc. No. 446;
Trial Ex. M); the buyer was ARD, which received an assignment of the Casey Creditors' allowed
secured claims and used them to credit bid. The settlement payments described in the Settlement
Order were paid at closing. The creditors who settled their claims with the Trustee received
allowed claims or funds in amounts ranging from $70,000.00 to $675,000.00, in accordance with
the terms of the settlement (*Id.*) The remaining proceeds were paid to the estate. (*Id.*)

## I. *Henry's State Court Action*

About 20 months after the Settlement Order was entered and five months after the sale of the
Properties closed, on July 13, 2018, Henry sought to collect his Legal Fee Claim in a lawsuit filed
in the Chancery Court of Hamilton County, Tennessee (the "State Court Action"). He named
Allen, the Casey Creditors, and ARD as defendants. On August 13, 2018, the Casey Creditors and
ARD removed the action to this Court, which became Adversary Proceeding 1:18-ap-01029-SDR
(the "1029 Proceeding"). The Casey Creditors contended they had been released from Henry's
claims through the settlement, and ARD contended that its ownership of the real estate was free
and clear of all liens and encumbrances. ARD retained separate counsel, who began working on
the case on August 16, 2018. (Trial Ex. 27.) All the defendants agreed that "the Plaintiff's claims
in the State Court Action are directly contrary to and violate the Orders issued by this Court."
(1029 Proceeding, Doc. No. 1 at 2 ¶ 4.)

21

Henry's state court complaint recited many of the same allegations raised in his Settlement Objection. He even gave a name to the implied partnership that he believed existed between Allen and Emma beginning in 1996—the "Casey Family Partnership" (the "CFP") and named it as a defendant along with the Casey Creditors. (1029 Proceeding, Doc. No. 1-1 at 1–2.) Henry revived his "course of dealing" allegations against Emma, again claiming she contributed millions to CFP since 1991, by writing personal checks to Allen, who in turn funneled the money to Casey family projects. (1029 Proceeding, Doc. No. 1-2 at 3–4 ¶¶ 9–13.) He alleged that Emma personally guaranteed bank loans that Allen obtained, which helped her retain control and ownership of the Properties. (*Id.* at 5 & 27 ¶¶ 15,18, & 26–27.) All of the actions allegedly giving rise to the creation of the Casey Family Partnership occurred prior to the Debtor's bankruptcy. Moreover, all of the allegations made were ones Henry had already made in the Bankruptcy Court, except he added ARD as a member of this family partnership.

The state court complaint alleged that venue was proper in the Chancery Court of Hamilton County, Tennessee based on T.C.A. § 16-11-114. Notably, that statute relates to bills seeking to divest or clear the title to land, or to enforce the specific execution of contracts relating to realty or to foreclose a mortgage. His complaint also alleged venue to be proper under the provision for transitory actions, T.C.A. § 20-4-101; thus, even Henry's selection of venue statutes is further evidence that he was seeking to regain an interest in the Properties.

The state court complaint contained two counts. (1029 Proceeding, Doc. No. 1-2 at 11–14; Trial Ex. 16.) In Count I, Henry alleged that Emma engaged in a course of dealing that constituted a contractual agreement to pay his legal bills and that she had breached that agreement by not providing payment. (*Id.* at 11.) As discussed above, his claims that Emma was "constantly

22

promising" to pay him were not supported by either written or verbal testimony. Henry offered no

other proof at trial of a course of dealing between Emma and him directly that would have provided

a basis for a contract claim distinct from the implied-partnership theory.[8]

In Count II, Henry asked the state court to impose a resulting and constructive trust upon

the real estate of ARD and upon the other defendants' interests in ARD and any amounts owed or

payable by ARD to the Casey Creditors. Henry alleged that ARD acted as a front, allowing Emma

to buy the Properties and Lot 3 free and clear of the claims of creditors. (*Id.* at 12 ¶ 42.) Henry's

allegation against ARD is essentially a collateral challenge to the sale itself and/or an attempt to

impose some sort of successor liability on ARD. Either way, the naming of ARD as a defendant

to the state court was an attempt to hold ARD and its assets liable for Henry's Legal Fee Claim.

Among other remedies requested in the State Court Action, Henry sought the imposition

of a constructive trust that would include the Properties and Lot 3 and that would "be used to

satisfy all or any part of the damages awarded to Plaintiff." (1029 Proceeding, Doc. No. 64 at 13

¶ 4; Trial Ex. 21.) During the pendency of the litigation, Henry also recorded a lien lis pendens

against the Properties owned by ARD as well as other real property that Emma owned. (*Id.* at 13

¶ 3; Trial Ex. Q.) Henry contends he was only pursuing Allen's and Emma's interest based on his

assertion that they individually agreed to pay him. However, Henry admitted at trial that he had

undertaken no due diligence to ascertain if Emma or Allen even had an ownership interest in ARD

or were exercising any control over its operation. (Testimony of Henry, May 22, 2023, 10:07:51–

10:11:36.) He relied on rumors in the commercial real estate community provided by his son-in-

---

[8] At trial, Henry testified about a deposition in the Café Barge Creditor Litigation given by Emma in which she said he would be paid when the property sold. (Testimony of Henry, May 22, 2023, 10:28:13–28:36.) A copy of the deposition was not offered as evidence by Henry and so the court has given no weight to this testimony in analysis.

law to argue that he could pursue ARD as a new member of the Casey Family partnership. (*Id.*)

### J. The Trustee's Intervention in the 1029 Proceeding

The Trustee intervened, taking the position that Henry's new suit jeopardized the settlement and put his warranties in the Sale Agreement at issue. As noted above, the Trustee repeatedly testified at the settlement motion hearing that putting an end to ongoing litigation was the primary motivation for the Casey Creditors to reduce their secured claims and to transfer Lot 3 to be sold with the Properties. Faced with the allegations of violating the Settlement and Sale Orders, Henry amended his pleading several times to dismiss defendants and add factual details in an attempt to differentiate his claims from those the Trustee had settled, but each amendment returned to his implied partnership allegations against Emma. Based on the similarity of the facts alleged in the State Court Case to the Settlement Objection, the Court concluded that Henry's only basis for recovery was likely one that the Trustee had settled (1029 Proceeding, Doc. No. 78 at 3) and allowed the intervention.

Shortly after the case was removed to the bankruptcy Court, on August 28, 2018, Henry filed a notice of dismissal as to ARD, Lynn, and Elizabeth. After a procedural misstep, Henry did dismiss these parties on September 7, 2023. (1029 Proceeding, Doc. No. 12.) [9]

### K. Trustee's Complaint against Henry and Parties' Positions at Trial

In addition to removing the State Court Action to the Bankruptcy Court and filing counterclaims against Henry, the Trustee filed this adversary proceeding. In this proceeding, he sought to subordinate Henry's claim, hold him in contempt for filing the State Court Action and the lien lis pendens against ARD's property, and object to his claim. The Court disposed of the

---

[9] The 1029 Proceeding was ultimately voluntarily dismissed on February 10, 2023. (1029 Proceeding, Doc. No. 218.) Both Emma and Allen Casey had passed away during its pendency.

equitable subordination count and addressed some of the issues related to the claim in a summary

judgment. (Adv. No. 18-1044, Doc. No. 116.) The remaining issues surrounding the amount of the

claim were stipulated the morning of the trial. The Court proceeded to hear testimony on the issue

of contempt. The Trustee contended that Henry's act of filing the State Court Action and the lien

lis pendens were in contempt of both the Settlement Order and the Sale Order.[10]

The Trustee relied on language in the Settlement Motion incorporated into the Sale Order

to argue that pursuit of a settled claim is contempt. He maintained that Henry had no claim

remaining except his Legal Fee Claim and an effort to collect from the Casey Creditors and ARD

(outside of the proceeds) was an act of contempt, and Henry knew it.

In defense of the contempt count, Henry argued that ambiguity in the Settlement Order left

fair doubt in his mind that his claims survived and could be lawfully pursued. Specifically, he

argued that he could not tell whether the settlement released the equitable claims of

recharacterization and implied partnership theories or only claims based on the listed Bankruptcy

Code sections. He asserted that he also had a contract claim against Emma which was an individual

claim that the Trustee did not even have standing to settle. As for his implied partnership claim,

he argued that a creditor looking at the Settlement Order would not have known whether his

specific claim had been released. Finally, among other procedural problems he failed to raise at

the Settlement Motion hearing, he now disputes the Trustee's ability to release a claim such as

implied partnership or alter ego on a creditor's behalf under 11 U.S.C. § 544(b).

---

[10] For the sake of consistency with its prior rulings on the issue, the Court notes generally that contempt proceedings should be brought by motion in the main bankruptcy case under Bankruptcy Rule 9014. *See, e.g., Culberson v. Nationstar Mortgage, LLC (In re Culberson)*, No. 1:15-BK-15519-SDR, 2022 WL 2111268, at *17 (Bankr. E.D. Tenn. June 10, 2022) (citations omitted); *Moore v. Comenity Capital Bank (In re Moore)*, 521 B.R. 280, 289 (Bankr. E.D. Tenn. 2014). The situation here is distinguishable because no party ever sought to dismiss the contempt count from this adversary proceeding on procedural grounds.

As to the Sale Order, Henry's defense was that he took no action to interfere or stop the sale, and the estate received the benefits contemplated by the order. He claimed that his filing of the lawsuit against ARD and the filing of a lien lis pendens against ARD's property could not be an attempt to interfere with the sale because the sale had already occurred. He further argued that once the estate received the sale proceeds, no action he took against the purchaser was subject to the jurisdiction of the Bankruptcy Court because such actions could not affect the estate. He finally claimed he included ARD only to reach the partners/members' interests in an effort to satisfy his individual contractual claim against Emma and his guaranty claim against Allen.

## III.    DISCUSSION AND CONCLUSIONS OF LAW

### A.  *Subject Matter Jurisdiction and Contempt*

The Court has found on prior occasions that it has jurisdiction over this adversary proceeding and that the adversary proceeding is a core proceeding. Nonetheless, because Henry challenged this Court's jurisdiction in his trial brief and at closing argument, the Court will briefly address jurisdiction. Henry argued that an allegation of contempt has no effect on the bankruptcy estate and accordingly, Count II would not fall within this Court's jurisdiction. Henry further argued that the Trustee lacks standing to seek contempt against him because settled causes of action would not belong to the bankruptcy estate, nor does the bankruptcy code delegate pursuit of those causes of action to the Trustee.

Henry is correct that this Court's general practice is to disallow contempt actions in adversary proceedings and instead require a separate motion under Bankruptcy Rule 9014. However, because no one objected procedurally to the Trustee's inclusion of the issue of contempt in the complaint, this adversary proceeding does include an issue that would otherwise proceed by separate motion.

26

The resulting procedural posture has created the confusing impression that the Trustee has his own cause of action for liability and damages on the theory of contempt.  Be that as it may, the Court has at all times clearly understood Count II to be the equivalent of a motion for contempt. Additionally, the contempt in question concerns an alleged disregard of one or more of this Court's orders, and the Court always has statutory and inherent authority to interpret and to clarify its own orders to determine compliance. *See* 11 U.S.C. § 105(a); *See also Spradlin v. Richard*, 572 F. App'x 420, 427 (6th Cir. 2014) (unpublished decision); *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1140 (6th Cir. 1991); *In re Culberson*, 2022 WL 2111268 at *17 (Bankr. E.D. Tenn. June 10, 2022). Accordingly, and with the understanding that any penalty for contempt would be limited to compensatory damages, costs, and fees to the estate for having to pursue this adversary proceeding, the Court finds that it does have subject matter jurisdiction to consider the issue of contempt.

### B.  General Standard for Finding Contempt

"The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Inter'l Longshoremen's Association 1291 v. Phila.*, 389 U.S. 64, 76, 88 S. Ct. 201, 208, 19 L. Ed. 2d 236 (1967). The Sixth Circuit reiterated the Supreme Court's description of contempt when it stated "[c]ontempt is serious." *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017). In *Gascho*, the Court of Appeals reviewed a request for sanctions relating to a settlement order and held that the party seeking such sanctions "must demonstrate by clear and convincing evidence that the opposing party knowingly violated

27

a definite and specific order of the court." *Id.* at 800. (internal quotations marks and citations omitted.) "The burden of showing that an order is definite and specific is heavy." *Id.*

It is possible that contempt may be found absent specific directives in an order where the Bankruptcy Code clarifies what actions would be unlawful and who is prohibited from taking those actions. *See* 11 U.S.C. § 362(a) (itemizing the acts that may not be taken and stating that it is "applicable to all entities."); *Beckhart v. NewRez LLC*, 31 F.4th 274, 277 (4th Cir. 2022) (discharge orders generally prohibit foreclosure proceedings because they operate like injunctions as a matter of law); *In re Giles-Glores*, 646 B.R. 787, 795 (Bankr. S.D. Tex. 2022) (motion to dismiss adversary proceeding for violation of the automatic stay denied where the Debtor plausibly alleged that the creditor foreclosed on and sold his home before clarifying with the court whether the estate had title to the home). Notwithstanding these provisions, the orders which Henry violated do not involve a code section containing injunctive language to fill in a directive. Therefore, the language of each order must meet the tests of definiteness and specificity.

The result in *Gascho* turned on the meaning of definiteness, as the conduct in question occurred while the order was on appeal. The court held that definiteness required the order to be final. *Gascho* 875 F.3d at 801. By contrast, specificity was the issue in *International Longshoremen*, as the Supreme Court found the decree at issue to be "unintelligible." *Int'l Longshoremen's Ass'n Loc. 1291*, 389 U.S. at 76. When specificity is the issue, a court must ensure the order states in specific terms the acts that it requires or prohibits. *Id.* For example, in *In re Lane*, a contempt action to enforce a settlement agreement between a trustee and a group of family members regarding ownership of the property, the court relied on order language which categorized assets of certain entities as property of the estate. *Barney v. Lane (In re Lane)*, 2021

Bankr. LEXIS 1538, *24 (Bankr. D. Wy. 2021). The order approving the *Lane* settlement expressly stated that, "Should any person or entity dispute or question the Trustee's ownership and control of the Disputed Property during the pendency of the Debtor's Bankruptcy Case the Trustee is authorized to seek appropriate sanction, including contempt, for violation of this Order." *Id.* at *7. In *Lane*, the identification of parties subject to contempt was comprehensive—any person or entity. *Id.*The prohibited conduct was also clearly identified as disputing or questioning the Trustee's ownership and control of the Disputed Property. *Id.*

In another case involving pursuit of a claim after a sale, the following directive was found to be specific enough:

> [a]ll persons and entities holding liens, claims, encumbrances or interests in or against the property or in any way relating to the property are hereby forever barred, estopped and permanently enjoined from asserting against the property and [the buyer], such persons' or entities' liens, claims, encumbrances or interests in and to the Property.

*Heaney v. Lamento (In re Whiz Kids Dev., LLC)*, 576 B.R. 731, 739 (Bankr. D. Mass. 2017) (an interest holder in property sold by a trustee was held in contempt of the sale order as a result of overtly and intentionally continuing to assert his interest in the property after the sale, and for publicly calling into question the status of the purchaser's title). In the case at bar, neither the Settlement Order nor the Sale Order has the clarity of the orders present in *In re Lane* or *In re Whiz Kids Dev. LLC*. Consequently, the Court is left to determine whether their contents are sufficient to meet the heavy burden set by the Sixth Circuit.

At the Supreme Court level, the 2019 *Taggart* ruling clarified that a finding of contempt requires the court to determine whether there is no "fair ground of doubt" as to whether the creditor's conduct might be lawful under the orders at issue. *Taggart*, 139 S. Ct. at 1804. The Sixth Circuit Court of Appeals has not interpreted *Taggart* as of this writing, but the Bankruptcy

Appellate Panel has provided helpful guidance. *See Orlandi v. Leavitt Family Ltd. P'ship (In re Orlandi)*, 612 B.R. 372 (B.A.P. 6th Cir. 2020).

Both *Taggart* and *Orlandi* involved a violation of the discharge order. The *Orlandi* panel held the that the creditor was aware of the discharge order and intended the acts that violated the order; however, the court noted conflicting case law as to whether the Debtor's liability on a guaranty was a contingent dischargeable prepetition debt. *Id*. at 382. Because of the conflicting case law, the creditor had a fair ground of doubt as to whether his debt had been discharged. *Id*. at 383. Under pre-*Taggart* Sixth Circuit law, "a willful violation of the discharge injunction could occur 'even though the creditor believed in good faith that its actions were lawful.'" *Id.* at 382 (citing *McCool v. Beneficial (In re McCool)*, 446 B.R. 819, 823 (Bankr. N.D. Ohio 2010)). The Supreme Court ruling in *Taggart* modified that rule, and the BAP restated the *Taggart* standard as:

> In other words, there is no fair ground of doubt when the creditor violates a discharge injunction "based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id.* at 1802. A "creditor's good faith belief" that the discharge injunction does not apply to the creditor's act that violated the discharge injunction does not by itself preclude a civil contempt sanction. *Id.* Conversely, it is not sufficient to hold a creditor in civil contempt by finding that "the creditor was aware of the discharge order and intended the actions that violated the order." *Id.* at 1803.

*In re Orlandi*, 612 B.R. at 382.

Post-*Taggart* case law in other jurisdictions has emphasized that "[t]o form the basis for contempt, an order must leave 'no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden.' . . . The very purpose of the civil contempt power is to induce compliance with a court's injunction." *PHH Mortg. Corp. v. Sensenich (In re Gravel)*, 6 F.4th 503, 512–13 (2d Cir. 2021); *See also In re Taggart*, 980 F.3d 1340, 1347 (9th Cir. 2020) ("The standard

is rooted in the concept that basic fairness requires that those enjoined receive explicit notice of

what conduct is outlawed before being held in civil contempt.") (citing *Taggart*, 139 S. Ct. at 1799)

(internal quotation marks and citation omitted). The movant in a contempt action bears the burden

of setting forth facts warranting relief by clear and convincing evidence. *In re Kimball Hill, Inc.*,

620 B.R. 894, 905 (Bankr. N.D. Ill. 2020). Once met, the burden then shifts to the respondent to

prove uncertainty in the decree. *Id*. (*citing Bateman v. GemCap Lending I, LLC (In re Bateman)*,

Case No. 1:16-BK-00982, 2019 Bankr. LEXIS 2453, 2019 WL 3731532, at *5–6 (B.A.P. 9th Cir.

Aug. 7, 2019) (finding that the burden shifts under *Taggart*).

### C.  *The Settlement Order Was Not Specific Enough to Support a Finding of Contempt*

The Settlement Order is a final order so the question before the Court is not one of definiteness,

but rather of specificity. Henry contends the language in the Settlement Order was not specific as

to whether his implied partnership and recharacterization claims were settled by the Trustee. In

addition, he contends that his contractual claim could not have been settled by the Trustee under §

542 and therefore he reasonably believed he could pursue it even after the settlement.

When the Court looks at the language of the Settlement Order, there is no express release

for recharacterization and implied partnership claims. Also, there is no injunctive language

directed to creditors prohibiting them from pursuing individual actions based on the conduct

described by Henry and the Trustee in the Settlement Objection and at the settlement hearing. A

creditor must go to the Settlement Motion, which is incorporated by reference, to find the Casey

Release. Even if a creditor consulted every document incorporated by reference, the creditor could

have determined its claim fell outside one of the enumerated categories; the Trustee acknowledged

at the settlement hearing that there were individual claims which remained outside of the Casey

Release.

Henry also presented various standing issues by arguing: (1) the Trustee may never have had a right to settle Henry's cause of action for implied partnership; (2) the Trustee could not bring the action as a representative of the unsecured creditors under Section 544(b) (Adv. No. 18-1044, Doc. No. 206 at 11); and (3) the Trustee lacked standing as a successor to the interests of the Debtor under Sections 704 and 541(a).  He supports these arguments with an analogy to a line of cases involving alter ego claims. (*Id.* at 12 § 4.) With respect to section 544(b), Henry argues that this section allows only avoidance of a transfer and does not authorize a Trustee to bring an action against third parties to recover based on a claim that belonged to creditors.

Admittedly, the law related to the Trustee's right to bring actions as a representative of the estate under Section 541 or as a representative of creditors under Section 544 is complicated. While the Trustee's standing would be clear if the Settlement Motion had stated that one of the controversies involved fraudulent transfers and the Casey Creditor lien was avoided under a fraudulent transfer theory under Section 548, the Court finds there is also authority that a Trustee can pursue an implied partnership theory of liability. *See* Tenn. Code Ann. § 61-1-306(a) (for the proposition that all partners are jointly and severally liable for all obligations of the partnership); *see also In re B&L Lab's, Inc.*, 62 B.R. 494 (Bankr. M.D. Tenn. 1986) (the trustee alleged a defendant was a general partner despite his defense that he was only a lender to his debtor brother and the court agreed, holding the defendant liable for the unsecured debt of the estate). As for alter ego claims, the intersection of complicated bankruptcy law concerning the extent of a trustee's powers under Section 544(b) with not altogether consistent state law on who owns an alter ego claim could certainly leave a creditor with a fair ground of doubt. *See Regions Bank v. J.R. Realty*

32

*Partners, Ltd.*, 912 F.Supp.2d 604, 617 (M.D. Tenn. 2012) (an alter ego claim is not property of

the estate); *See also Limor v. Buerger (In re Del-Met Corp.*), 322 B.R. 781, 830 (Bankr. M.D.

Tenn. 2005) (noting a . . . patchwork of reported decisions addressing whether a bankruptcy trustee

has standing to disregard corporate form in an action to reach the assets of a nondebtor or to hold

a nondebtor responsible for debts of the debtor."); *but see In re Crabtree*, 39 B.R. 718, 723 (Bankr.

E.D. Tenn. 1984) (court found it had power to disregard separate corporate entities to reach assets

to satisfy debts of the bankruptcy corporation from its nondebtor alter ego).

Henry did not raise any of these arguments in his Settlement Objection, and as the Sixth

Circuit stated in the Final Order of Henry's appeal, ". . . Henry had a full and fair opportunity to

object to the settlement terms."(Adv. No. 18-1044, Doc. No. 227, p. 3–4) (emphasis added.) Henry

is now barred from asserting these arguments to overturn the settlement, but he may still use the

confusion in this area of the law to provide a reasonable basis for believing he could lawfully

pursue his claims.

In the case of *In re Berg*, 376 B.R. 303 (Bankr. D. Kan. 2007), the debtor, his wife, and

their limited liability company settled a fraudulent transfer action with the trustee and received a

release of the trustee's claims against the wife. A bank which was a creditor in the husband's case

was involved in the settlement negotiations and sought a carve out of its claims against the debtor's

wife. *Id*. at 308. The settlement was approved without the carve out and without opposition from

the bank. When the bank later sued the wife based on the fraudulent transfer, she sought sanctions

for contempt. *Id*. at 310. The court found that the lawsuit against the wife was barred and that she

had been released from the bank's claim. *Id*. at 313. However, because the settlement order did

not contain an "express prohibition which was violated by the bank," the settlement orders could

33

not be the basis for civil contempt as "they lacked the imprimatur of an injunction." *Id.* at 315. The *Berg* court relied on the Tenth Circuit's requirement that a prohibitory provision of a settlement agreement approved by a court order cannot be enforced by civil contempt unless the prohibition is expressly set forth in a court order. *Id.* at 315 (citing *Consumers Gas & Oil, Inc. v. Farmland Indus. Inc.*, 84 F.3d 367, 370 (10th Cir. 1996). The Court has not found any Sixth Circuit case law that would allow this Court to reach a different conclusion.

The Court has no doubt Henry was aware that the Trustee and Emma believed they were settling implied contract claims. The settlement was supposed to end all litigation between Emma and creditors of the Debtor's estate—with one exception—a creditor holding an individual claim against Emma. Henry knew the implied partnership/recharacterization argument against the settling parties had been raised by the Trustee (as the representative of all creditors), and that Emma and Lynn agreed to the settlement, reducing their secured claims, and causing Trinity Hotel Partners to convey a lot to the estate. In exchange, they believed they were receiving a release of those claims. Henry, in fact, discussed the factual basis for those claims in his Settlement Objection. Subjectively, Henry knew that the implied partnership claim was being settled on behalf of all of the creditors based on the Trustee's testimony at the settlement hearing. He failed to raise the issue until he was faced with contempt. Nevertheless, the Court must apply the applicable standard, which is an objective one; the Trustee's burden is heavy, and any doubt favors the party who is accused of violating the order. *Taggart*, 139 S. Ct. at 1802. Like the settlement order in *Berg*, the Settlement Order in this case fails to contain an express prohibition to non-settling creditors specifying what claims were settled and could no longer be raised. Consequently, the Court finds that the Trustee has fallen short of meeting his heavy burden of proof regarding the

Settlement Order.

The Court's conclusion is further supported by Henry's claim that his pursuit of an individual contract action was lawful because the order offers no clarity on whether the Casey Release also foreclosed an individual contract action based on the same facts giving rise to the implied partnership claim. Pursuit of a specific contractual action against Emma would not be an action delegated to the Trustee by the Bankruptcy Code. If Henry has an individual contract action against Emma, he could have pursued it just as he could pursue the guaranty of Allen Casey without running afoul of the Settlement Order. Because Henry was not a party to the settlement and did not grant a specific release, he claims he reasonably thought his individual cause of action survived the settlement. The reasonableness of his belief in a contractual action is suspect given the absence of any written guaranty or even a direct unconditional verbal promise by Emma. Henry's course of dealing theory relied on the same facts that supported his implied partnership claim. Despite the similarity of the course of dealing claim to the implied partnership claim, the lack of specificity in the Casey Release leaves room for Henry's doubt.

Without a specific release of those types of claims coupled with a directive in the order prohibiting any such further pursuit of the Casey Creditors, the Court finds that contempt is not the appropriate remedy. If Henry's contract claim against Emma is meritless, the remedy would be for Emma to seek damages under Bankruptcy Rule 9011 or its state law counterpart for frivolous litigation had the lawsuit continued. Moreover, the Court finds there to be a reasonable basis for Henry to think that he could still pursue the Casey Creditors under either his contract theory because it was specific to him; or to pursue an implied partnership theory because of complicated legal issues surrounding a trustee's standing to bring such actions under 11 U.S.C. § 544(b).

35

Whether those actions would have been sanctionable by the Casey Creditors under Rule 11, given the weakness of Henry's contractual theory and participation in the settlement hearing, is a moot point due to the resolution of the claim by dismissal of the 1029 Proceeding.

Finally, Henry also argued that (1) the Trustee did not meet his factual burdens of showing that Emma's taking liens for equity contributions harmed the Debtor; (2) the Trustee was not specific enough in the Settlement Motion about the harm to the estate that the Trustee could have survived a motion to dismiss from the targets of a recovery action; and that the Trustee could not have settled the case because the statute of limitations had run. Having found that the Settlement Order was not sufficiently specific for the court to find Henry in contempt, the Court need not address these additional defenses.

### D. The Sale Order Was Specific Enough to Support a Finding of Contempt

The Court will now consider whether Henry's filing of the State Court Action against ARD was contempt of the Sale Order. (Main Case, Doc. No. 443; Trial Ex. L.) The Trustee faces the same burdens with respect to this order. The Trustee must show by clear and convincing evidence that Henry knew of the Sale Order, that Henry violated the Sale Order, and that the Sale Order was specific and definite. The level of specificity and definiteness must be such that a creditor could have no objectively reasonable basis to conclude that his conduct was lawful.

Henry's defense to contempt of the Sale Order does not challenge the specificity of the order, but rather challenges the Court's jurisdiction over any dispute related to the Properties and Lot 3 after the sale. He cites two cases in which disgruntled purchasers returned to the bankruptcy court to seek enforcement of terms of their purchase. In *In re Hall Motor Transit Co.*, 889 F.2d 520, 522 (3d Cir. 1989), the Court of Appeals for the Third Circuit found that it did not have

jurisdiction over a dispute between the buyer and a municipality created by zoning changes which occurred while the property was part of the bankruptcy estate. The court noted that if the debtor had brought the action against the municipality under 11 U.S.C. § 362(a) before the property left the estate for a violation of the stay, there would have been jurisdiction. *Id*. at 523. The court went on to find that the relief requested—enjoining the municipality from ticketing the buyer's trucks— would have no effect on the estate. *Id*.

In this case, ARD returned to this court to determine if the court's free and clear language meant what it said. It also could have filed a claim against the Trustee for breach of the purchase contract. Only because Henry dismissed his claims against ARD shortly after his State Court Action was removed, does his dispute with ARD have no further effect on the estate at this time.

The Court also finds the other case Henry cited, *Herd v. Herd (In re Herd)*, No. 06-10851, 2007 WL 2481369 (Bankr. E.D. Tenn. Aug. 28, 2007), to be distinguishable.  The *Herd* case involved a bankruptcy sale of debtor Kelly Herd's business assets to Thomas and Teresa Herd. *Id*. at *1. The sale order contained a specific agreement about the use of the seller's name after the consummation of the sale. *Id*. The purchasers returned to court seeking to hold the seller in contempt for violations of copyright related to their acquisition of his jewelry business. *Id. generally.* The court found that it did not have jurisdiction over the matter because whether the court found a violation of the copyright for post-petition conduct would have had no effect on the estate. *Id.* at *5.

Again, Henry's actions would have had an effect on the estate but for the dismissal. The Court has found that Henry's challenge required the Court to address its order and as such, the Court has jurisdiction. See *In re Whiz Kids Dev., LLC*, 576 B.R. at 751-753.

37

The Court finds the Trustee has met his burden with respect to the Sale Order. Paragraph 17 of the Sale Order recited that the Properties along with Lot 3 would be sold "on the terms and conditions set forth in Contract for Purchase and Sale attached hereto as Exhibit 1, as modified herein, free and clear of all liens, claims, rights, interests and encumbrances of any party receiving notice." (Main Case, Doc. No. 443 at 5 ¶ 17; Trial Ex. L.) The Trustee has established that Henry was aware of the Sale Order, and the Court finds the order to be sufficiently clear that any lienholder could no longer enforce its lien against the Properties or Lot 3. Paragraph 17 continues, "with all valid, and perfected liens, claims, rights, interests and encumbrances, as later determined by the Court, to attach to the net proceeds of the sale." (*Id.*) That same lienholder should also have known that its rights to recover on that lien or claim were limited to the proceeds, and that the extent of that attachment would be determined by the Bankruptcy Court, not another court.[11] The purchase and sale agreement contained a representation and warranty by the Trustee on behalf of the estate that he was:

> the sole owner of the Property, or has bankruptcy court authority to convey the Property, in fee simple, free and clear of all items (other than mortgages, if any, which [Trustee] shall be obligated to extinguish at the Closing, leases which [Trustee] will terminate prior to Closing and bankruptcy protection, which will be satisfied and terminated by [Trustee] via court approval on or before Closing), to include without limitation encroachments, gaps or gores; and [Trustee] shall convey the Property to Buyer at Closing free and clear of all items, including any liens or mortgages, leases, occupancy agreements or any physical tenants or occupants.

(*Id.* at 10 ¶ 18(a).)

---

[11] The Sale Motion reinforced that limitation. It recited that the Buyer was unwilling to purchase the property only to be forced to repeatedly litigate the "the issue with individual claimants after the sale is completed." (Main Case, Doc. No. 425 at 15 ¶ 33; Trial Exs. 6 & K.) It stated that "any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of this Chapter 7 case." (*Id.*)

The burden now shifts to Henry to show he had a reasonable belief that suing ARD was lawful. He argues that he was only trying to attach to Emma and Allen's interest in ARD, but his defense fails because the claims in his original complaint sought to impose liens on ARD's property, not just upon Emma and Allen's interests. Even his contention that Emma and Allen had interests in ARD fails the reasonableness requirement.

In his representation of the facts contained in the JSOIF, Henry identifies the catalyst for his bringing the State Court Action was learning "that Emma and Allen had begun a business relationship for profit which combined Emma's assets, interests in ARD, cash and personal credit resources with Allen's labor, skill, and real estate business experience to form a partnership for the sale of the Lots now owned by ARD." (Adv. No. 18-1044, Doc. No. 198 at 6 ¶ 49.) "Based on this information and belief, Henry considered that Allen and Emma had a hidden ownership interest in the assets of the newly acquired ARD."(*Id.* at 6–7 ¶ 50.) "Henry considered that the above business relationship between Allen and Emma was in fact a new partnership which arose post-petition and post-sale of the Lots (the "Emma and Allen Partnership or AEP"), and it was similar to the old partnership that existed before bankruptcy." (*Id.* at 7 ¶ 51.) "Allen and/or Emma signed a real estate listing agreement or other document with commercial realtor(s) that they had authority to sell the ARD Lots, or they represented that they did." (*Id.* ¶ 52.)

The Trustee disputed these allegations; and at trial, Henry admitted that he had done no independent investigation to confirm the accuracy of the allegations before he named ARD in his lawsuit. He admitted he had relied on "rumors" in the commercial real estate market conveyed to him by his son-in-law. Henry could produce no evidence of Emma's involvement in the operations of ARD, ownership of ARD, or even the signed real estate listing agreement. He made no inquiry

of ARD's attorney or its officers about the ownership or management of the limited liability company. Even if he had a basis for thinking his claims against Emma had survived the settlement, there is simply no factual basis for his argument that he was pursuing ARD on a basis other than his prior lien or bankruptcy claim. If he brought his action solely to capture Emma and Allen's interests in ARD, he made no inquiry to confirm that they even had such interests. The testimony at trial was that Allen and Emma had no interest in ARD and were exercising no authority.

Henry pursued a direct claim against ARD. His allegation that ARD had formed a new partnership with Emma and Allen was not supported by any evidence from a managing member of ARD. There was no evidence of conferences with Emma and Allen. He cited no representation to him from a principal of ARD (or Allen or Emma) agreeing to pay for Henry's services performed in years prior to ARD's formation. *See* Tenn. Code Ann. § 61-1-306(b) ("A person admitted as a partner into an existing partnership is not personally liable for any partnership obligation incurred before the person's admission as a partner"). The Court finds that unsubstantiated and unconfirmed rumors do not create "fair doubt" under the *Taggart* standard.

Under *Taggart*'s directive that the Court must apply an objective standard, the Court finds that the Sale Order was sufficiently specific to put a creditor on notice that it could not seek to recover its claim directly against the purchaser (in this case, ARD). The order provided that the creditor's remedy was to look to its share of the proceeds of the sale as determined by the Bankruptcy Court. While repeating the limitation on recovery to proceeds in the form of an injunction would have made the Trustee's case more clear-cut, specificity does not require redundancy. As all parents know, an instruction to stay seated in a chair does not also require an instruction not to get out of the chair before there are consequences. In this case, Henry used his

bankruptcy claim as the basis to name ARD in the State Court Action and place a lien lis pendens on the Properties that had been sold free and clear of his claim and lien. These were acts of contempt.

### E. Damages

Contrary to Henry's contention, his actions caused harm to the estate. It had to incur fees to stop him and prevent sale warranty claims. As such, the Court must address what damages are appropriate. The Court heard testimony from Douglas Johnson about the fees ARD incurred in removing the action. He testified that he billed ARD $3,300.00 for his services related to the state court complaint. He also testified that he made a demand on the Trustee to reimburse ARD for those fees which ARD paid. On cross examination, Mr. Johnson testified that the estate has not paid him nor reimbursed ARD.

As for the damages to the estate, the violation of the Sale Order began with the filing of the state court complaint against ARD on July 13, 2018. Emma Casey removed the suit, and Henry began seeking to dismiss ARD, on August 28, 2018 (1029 Proceeding, Doc. No. 8); he succeeded on September 7, 2018 (1029 Proceeding, Doc. No. 12). The lien lis pendens on the Properties and Lot 3 were also released by this date. Accordingly, the Court will grant damages for the Trustee's services and expenses in pursuing the contempt action for fees until the action was dismissed. The Court has the benefit of the Trustee's fee applications for this period, and based on the description of services, the Court finds those fees to be $1,700.00 for the period from 7/30/2018 to 9/7/2018 and expenses of $18.50 incurred on 7/23/2018. (Main Case, Doc. No. 520 at 3 & 15; Trial Ex. 22.)

With respect to the claim for $3,300.00 related to ARD's demand, the court finds that those fees were incurred by ARD as a direct result of Henry's contemptuous actions and have been paid

41

by ARD. However, the Court will not include that sum as part of the contempt judgment at this time. Those fees have not been paid by the estate. ARD has not filed a claim, sought an administrative expense nor instituted any litigation to recover those fees other than the initial request made by Mr. Johnson. Therefore, there has been no determination that the fees are the responsibility of the estate under the sale agreement. The adversary proceeding in which the Trustee asserted a counterclaim against Henry has been dismissed by stipulation in which the remaining parties indicated that they had "resolved all remaining issues between them." (1029 Proceeding, Doc. No. 218.) Should ARD pursue such a claim and the estate be ordered to pay it, then the Court will amend this judgment to include this amount, provided the Trustee requests payment prior to filing a final report.

## IV.    CONCLUSION

The Court finds that the Settlement Order was not specific enough to remove any reasonable doubt about whether a creditor's further pursuit of claims based on implied partnership, recharacterization, or contracts would be lawful. To reach this conclusion, the Court relies on the discrepancy between the description of the controversies the trustee sought to settle and the specific causes of action addressed in the Casey Release as recited in the Settlement Motion; the lack of specific release language in the settlement agreement; the discussion at the settlement hearing regarding how some creditors' individual claims were not covered by the settlement; the lack of specificity in the Settlement Order; and finally, uncertainty in the state of the law regarding a Trustee's standing under Sections 541 and 544. Therefore, the Court finds that the Trustee has not met his burden to establish that the Settlement Order was so specific that Henry should be held in contempt. Although the Court is skeptical about the merits of Henry's individual claims against

the Casey Creditors, the Trustee must still first carry his burden on specificity.

The Court reaches a different conclusion with respect to the Sale Order. The Motion and Order were more specific and all-inclusive. All claim and interest holders were clearly limited to pursuing recovery from the proceeds in the Bankruptcy Court. The alleged circumstances which Henry contends gave rise to his belief he could pursue ARD did not exist, and he made no reasonable inquiry to discover whether his beliefs were accurate before he took actions to enforce his bankruptcy claim against ARD and the Properties. For those reasons, the Court finds that the Trustee has met his burden to show that Henry had notice of the Sale Order, took an act contrary to that Sale Order, and that the Sale Order was specific and definite enough to remove any fair ground of doubt that pursuing ARD for the Legal Fee Claim against the Debtor would not violate the Court's Sale Order.

Having found a violation, the Court also assesses damages against Henry in the amount of $1,718.50.

Other than the damages awarded to the Trustee, the parties will bear their own costs for the litigation in this adversary proceeding.

A separate order will follow.

# # #